Exhibit A

# Exhibit A

## Commonwealth of Massachusetts

SUFFOLK, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO.  2184CV01533

Simone Gregg
_____, PLAINTIFF(S),

v.

Northeastern University and Paul Zernicke,
Maryellen Shea, Diana ___, DEFENDANT(S)
Fitzgerald, Alexis Harding and Brigid Molloy
**SUMMONS**

THIS SUMMONS IS DIRECTED TO  Northeastern University
_____. (Defendant's name)

**You are being sued.**  The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the  Suffolk Superior  Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story.  You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff.  **If you need more time to respond, you may request an extension of time in writing from the Court.**

How to Respond.  To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented).  You can do this by:

a.  Filing your **signed original** response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton  Square, 12th Floor, Boston, MA   02108 (address), by mail or in person, **AND**

b.  Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:  22 Mill Street, Suite 408, Arlington, MA   02476

What to include in your response.  An "Answer" is one type of response to a Complaint.  Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer.  You can also respond to a Complaint by filing a "Motion to Dismiss," if you believe that the complaint is legally invalid or legally insufficient.  A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4.   **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

~~HELLER XX XXXXXXXII XX XXXXXXXX~~

Witness Hon. ~~XXXXXXXXXXX~~, Chief Justice on ___July 13___ , 20 21 .
                      Judith Fabricant,

*Michael Joseph Donovan*

Michael Joseph Donovan

Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.


## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____, 20___, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

_____

_____

_____

Dated: _____, 20___      Signature: _____


N.B.   TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

> *AUG. 23, 2021*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
                                                     DEPARTMENT OF THE
                                                     TRIAL COURT
                                                     DOCKET NO.   2184CV01533

———————————————————— )
                                                  )
                                                  )
SIMONE GREGG,                                     )
                                                  )
                    Plaintiff                     )
                                                  )
                                                  )
                                                  )
v.                                                )
                                                  )
                                                  )
                                                  )
                                                  )
NORTHEASTERN UNIVERSITY AND                       )
PAUL ZERNICKE, MARYELLEN SHEA,                    )
DIANA FITZGERALD, ALEXIS HARDING,                 )
and BRIGID MOLLOY                                 )
                                                  )
                    Defendants                    )
———————————————————— )

## COMPLAINT

In this employment related matter, the Plaintiff, SIMONE GREGG ("Plaintiff" or "Ms. Gregg"), sets forth below her Complaint against the following defendants: Defendant, NORTHEASTERN UNIVERSITY ("Defendant NORTHEASTERN"), Defendant MARYELLEN SHEA ("Defendant SHEA"), Defendant ALEXIS HARDING ("Defendant HARDING"), Defendant BRIGID MOLLY, and Defendant PAUL ZERNICKE ("Defendant ZERNICKE"). Ms. Gregg alleges that the Defendants' continuing course of conduct over the course of her tenure with Defendant NORTHESTERN violated her rights under the Family Medical Leave Act ("FMLA"), intentionally interfered with Ms. Gregg's employment and also resulted in her intentional infliction of emotional distress.

### THE PARTIES

1. The Plaintiff, SIMONE GREGG ("Ms. Gregg" or "the Plaintiff"), is an individual residing in Suffolk County, MA.

2. The Defendant, NORTHEASTERN UNIVERSITY ("Defendant NORTHEASTERN"), is a Massachusetts private university and educational institution located at 360 Huntington Ave, Boston, MA 02115.

3. The Defendant, PAUL ZERNICKE ("Defendant ZERNICKE") is an individual residing at 360 Huntington Ave, Boston, MA 02115, and was the Plaintiff's

supervisor at Defendant Northeastern during all relevant times of the events alleged in this Complaint.

4. The Defendant, MARYELLEN SHEA ("Defendant SHEA"), is an individual residing at 360 Huntington Ave, Boston, MA 02115 and at all relevant times, was employed by Defendant Northeastern.

5. The Defendant, DIANA FITGZERALD ("Defendant FITZGERALD") is an individual residing at 360 Huntington Ave, Boston, MA 02115, and at all relevant times, was employed by Defendant Northeastern.

6. The Defendant, ALEXIS HARDING ("Defendant HARDING"), is an individual residing at 360 Huntington Ave, Boston, MA 02115 and at all relevant times, was employed by Defendant Northeastern.

7. The Defendant BRIGID MOLLY ("Defendant MOLLOY"), is an individual residing at 360 Huntington Ave, Boston, MA 02115 and at all relevant times, was employed by Defendant Northeastern.

## FACTUAL ALLEGATIONS

8. The Plaintiff refers to the allegations of Paragraphs 1 through 7 and by such reference repleads and incorporates them as though fully set forth here.

9. Ms. Gregg is a Black female who has suffered from severe chronic medical conditions during the relevant events in this matter.

10. During October 2017, Ms. Gregg began her first day at Defendant Northeastern as a temporary employee in the Development Office through a temporary staffing agency, Panther Group.

11. During the summer of 2017, Ms. Gregg required FMLA leave due to her chronic medical conditions. Defendant Northeastern approved Ms. Gregg's FMLA leave.

12. On November 27, 2017, after receiving favorable performance reviews, Ms. Gregg became a full-time permanent employee at Northeastern working for Defendant Paul Zernicke ("Defendant Zernicke") as his Development Associate. In this capacity, she was responsible for supporting fundraising efforts through the implementation of back-office, operational services and the facilitation of pipeline development activities. During this time, Ms. Gregg also enrolled in Defendant Northeastern's Masters in leadership program with a Human Resources Management Graduate Certificate, which she attended in the evening, following the end of her work day. Ms. Gregg was nonetheless committed to both professional and academic excellence as she strived to utilize her education to develop a career related to leadership positions with an interest in the human resources field.

13. During May 2018, in a meeting with Defendant Maryellen Shea ("Defendant Shea"), Senior Human Resources ("HR") Benefits Specialist, Ms. Gregg discussed her medical condition and Defendant Shea expressed that she was aware that Ms.

2

Gregg had received FMLA leave during the summer of 2017. During this time, Ms. Gregg also requested an ergonomics chair as a reasonable accommodation for her medical conditions.

14. Defendant Shea also told Ms. Gregg that she knew about her medical condition as she had previously worked in a hospital as a technician.

15. On June 8, 2018, Ms. Gregg asked Defendant Alexis Harding, a HR Business Partner ("Defendant Harding") at Defendant Northeastern, for her job description as she had not received one at the time of her permanent hire.

16. Ms. Gregg requested from Defendant Zernicke to work through lunch so that she could leave early from work to attend medical appointments and he did not respond positively to this request.

17. On June 18, 2018, given her excellent performance, Ms. Gregg received a merit raise of $1,157.00.

18. On or about August 8, 2018, Ms. Gregg received an ergonomics chair as an accommodation under the American with Disabilities Act ("ADA").

19. On or about August 15, 2018, Ms. Gregg submitted a request for FMLA continuous, intermittent leave as a result of increased challenges due to her medical conditions as well as a request for ADA accommodations. Defendant Shea told her that Defendant Harding could work with her in regards to her remote work request.

20. Ms. Gregg then took medical leave during August 2018 to September 4, 2018 as a result of an exacerbation of her medical conditions. Following this leave, she returned to work and committed herself to excelling in her role. She also continued to attend classes at Defendant Northeastern.

21. Over the course of the ensuing months, Ms. Gregg received ongoing medical treatment for her increasingly challenged medical conditions. To attend these appointments, she would either use her FMLA intermittent leave or attend these appointments during her work lunch period.

22. Upon her return from this August/September 2018 medical leave, however, Defendant Zernicke's treatment of Ms. Gregg deteriorated considerably and his misconduct subjected her to unfounded criticism, demeaning comments, and other deleterious changes to the terms and conditions of her employment that continued throughout her tenure. On September 6, 2018, for example, Defendant Zernicke, in unwarranted fashion, blamed Ms. Gregg for his own mistake in not remembering if he had met with a donor or not.

23. On September 6, 2018, Defendant Zernicke also reprimanded her for a task that he had never requested her assistance on, as he had failed to copy Ms. Gregg onto an email chain informing her of his assistance request.

24. In addition to these unfounded criticisms, Defendant Zernicke also discouraged Ms.

3

Gregg's participation in professional development opportunities. For example, on October 9, 2018, Ms. Gregg received an email from Kathleen Holtz, Assistant Director of Leadership Advancement, encouraging her to go to the CASE District 1 Conference. When Ms. Gregg let him know that she had applied to the conference scholarship, Defendant Zernicke discouraged Ms. Gregg's participation as he said that he believed that this participation would be subject to questioning, as he suggested that his colleagues may ask him, "Why is an assistant going to this?"

25. Defendant Zernicke also told Ms. Gregg that he thought it would be better for her to do on the job training and not leave the office. He then suggested an external training opportunity for minorities that was nine (9) months away. Ms. Gregg looked at him confused and asked him if that was his way of saying that he didn't want her to work for him, and in response, he said "Ohhh of course not".

26. Subsequently, on November 1, 2018, Ms. Gregg asked Defendant Zernicke if she could attend professional development workshops and training sessions relevant to her job that did not require her absence from work for long periods of time. Ms. Gregg even suggested using her lunch for these trainings as she had done in the past. These opportunities included two sessions entitled, "Microaggressions" and "Addressing Unconscious Bias." Immediately after emailing Defendant Zernicke this request, he called her on her office phone, and asked her in surprise and with defensiveness, "What the hell did I do??" He then laughed, leaving Ms. Gregg feeling extremely insulted and uncomfortable.

27. Upon her hire, and unlike her Caucasian and colleagues who had not requested FMLA leave, Ms. Gregg had never received any formal training. On November 6, 2018, Ms. Gregg therefore  requested training from her coworker, Alexa Armstrong, and through her other efforts, obtained additional training that was necessary for to complete certain tasks for Defendant Zernicke, including training in a program called Geopointe.

28. Defendant Zernicke's unwarranted blame towards Ms, Gregg nonetheless continued. On November 14, 2018, for example, Defendant Zernicke accused Ms. Gregg of not scheduling a meeting and in response, Ms. Gregg re-forwarded to Defendant Zernicke the message showing that the meeting had in fact been scheduled. On another occasion, Defendant Zernicke blamed Ms. Gregg for not remembering information about a Bruce Segal, when in fact that had been his mistake in failing to send her the necessary information on Bruce Segal.

29. During mid-November 2018, after having put in a vacation request in with the expectation of going overseas, Ms. Gregg later canceled it and subsequent to that cancellation, Defendant Zernicke rudely and inappropriately asked her what happened with her trip, and then, as she was about to answer, Defendant Zernicke cut her off, laughed and stated in demeaning fashion, "What, you couldn't afford it?"

30. On November 19, 2018, Defendant Zernicke then questioned whether Ms. Gregg's medical appointment was in fact medically related despite her telling him this in person. To avoid any issue with her work responsibilities, Ms. Gregg had been attending these appointments during her own personal time, lunch periods, and/or

during her FMLA intermittent leave.

31. On November 19, 2018, Ms. Gregg provided Defendant Zernicke with a proposed agenda and supporting documents in preparation for their upcoming meeting to address her request, made during the summer of 2018, for a salary increase.

32. On November 27, 2018, Ms. Gregg met with Defendant Zernicke to address the request for a salary increase. Despite having three weeks' advance notice to look at her prepared agenda to discuss this raise, he told her that he had not yet fully reviewed it.

33. Ms. Gregg's agenda had highlighted the contributions that Ms. Gregg had made since her hire. Defendant Zernicke however stated that he disagreed with some of her contributions, telling her that such duties were "a part of [her] job", despite the fact that they had fallen outside of her job description. Defendant Zernicke denigrated her further, telling her that the manner in which she negotiated was "not good and awkward." Defendant Zernicke even stated to her that Tim Keneally had approached him and recommended that she was deserving of a raise and that he had told him he disagreed with that recommendation.

34. On or about December 4, 2018, Defendant Zernicke denigrated Ms. Gregg once again as he questioned her skills and ability to handle three courses in a quarter for school when she had done so before and which he had previously approved via the tuition waiver.

35. On December 17, 2018, Defendant Zernicke increasingly questioned Ms. Gregg about her numerous medical appointments and issued her a directive requiring her to obtain his approval before she attended any other professional training sessions.

36. During this time, Defendant Zernicke increasingly placed limitations on Ms. Gregg's learning opportunities, despite the fact that Ms. Gregg had not even attended one conference yet. Meanwhile, she attended "Learning @ Lunches, HRM" and other professional developmental opportunities during her personal time because she was unaware that she could attend such events during work hours. Ms. Gregg had to defend herself to Defendant Zernicke and explained to him she had not attended anything that cost anything and that she was doing so on her own personal time.  Ms. Gregg also requested that she attend a management course during her lunch hour over the course of two days.  Ms. Gregg had inquired and received confirmation from the course director that her position as a manager was not required. Defendant Zernicke, however, declined Ms. Gregg's request for this educational opportunity.

37. On December 18, 2018, Defendant Zernicke informed Ms. Gregg that she would receive less than a two dollar raise although she had requested at least a five dollar increase in her salary.

38. On January 24, 2019, after Ms. Gregg's return from vacation, Ms. Gregg's doctor completed an updated FMLA Intermittent Leave Form and Ms. Gregg forwarded this information to Defendant Shea, requesting leave time for when Ms. Gregg felt sick and needed to take a day or so off or to leave early or at any time for an

appointment.

39. In response, Defendant Shea told Ms. Gregg that such leave would not be job protected under FMLA if it was just for sick time.

40. While Ms. Gregg had disclosed her initial medical diagnosis to Defendant Zernicke and to HR at about the time she needed a three-week medical non-intermittent FMLA leave during the summer of 2018, she became uncomfortable discussing her health because she had observed a significant change in the terms and conditions of her employment following her disclosure and her medical leave requests, especially in the Defendants' treatment of her. Even Defendant Shea engaged in challenging communications with Ms. Gregg. For example, Defendant Shea would ignore Ms. Gregg's updates and communications:

> From: Gregg, Simone
> Sent: Tuesday, January 22, 2019 8:51 AM
> To: Shea, Mel <ma.shea@northeastern.edu>
> Subject: RE: Meeting
>
> Why do you keep saying this.. no I'm not. I've confirmed multiple times via email and documentation that I was back after two weeks. I've been working every day since. This is very very concerning that I have to keep going through this with you. Can you direct me to someone else that I can speak with.
>
>
> From: Shea, Mel
> Sent: Tuesday, January 22, 2019 8:50 AM
> To: Gregg, Simone <s.gregg@northeastern.edu>
> Subject: RE: Meeting
>
> Hi Simone,
> I am not in the office today. You are currently on a medical leave since August is that correct?
>
> Best,
> Mel
> Maryellen (Mel) Shea
> Sr Benefits Specialist
> Northeastern University
> 716 Columbus Avenue, CP 250
> Boston, MA 02120
> Phone: 617-373-7706 /Fax: 617-373-7610
> ma.shea@northeastern.edu

41. On February 7, 2019, Ms. Gregg discussed her duties with Defendant Zernicke and explained that she would now be assisting another employee, Carla Kindt, since her assistant had moved on to another position. Ms. Gregg explained that she was now serving and assisting a total of four (4) people, which was well beyond her job description, but this was unsuccessful.

42. During this time period, Ms. Gregg and Defendant Zernicke were increasingly having conflicts regarding her needed medical appointments and Ms. Gregg sought assistance from Defendant Shea, but this was futile.

43. During February 13-14, 2019, Defendant Shea and Ms. Gregg reviewed Ms. Gregg's FMLA intermittent leave request and forwarded her Defendant Zernicke's signature on these forms. Ms. Gregg also requested that the approval process be expedited so that it may reduce the conflicts between Ms. Gregg and Defendant Zernicke over her medical appointments.

44. Thereafter, when Ms. Gregg requested that this time be unpaid, Defendant Shea told her that her "sick bank" needs exhaustion first.

45. On or about February 14, 2019, Ms. Gregg submitted her self-assessment to Defendant Zernicke documenting her accomplishments and contributions for the fiscal year, encompassing the work she had done for Defendant Zernicke and other supervisors.

46. In this self-assessment, she noted improvements that she needed to make as well as Defendant Zernicke's. She expressed concern about his micromangerial behavior and his lack of clarity on his instructions. She also reminded him that she was doing work for four people which fell outside her job description.

47. She noted further the lack of on the job training from the start of her working in this position and that she had taken the initiative to learn. She also requested that Defendant Zernicke respect her boundaries and allow her time to respond to emails in the event that she was away from her desk momentarily.

48. She also asked Defendant Zernicke for more support with developmental opportunities and suggested for them to have weekly-biweekly one on one meetings.

49. On February 15, 2019, Defendant Zernicke sent Ms. Gregg an email saying that he went to her desk, that she was not there and that he sees "a lot of unexplained busy" in response to inquiries he made on her work calendar. Ms. Gregg made him aware that "busy" is an automatic message if someone does not have access to another person's calendar details and that Ms. Gregg puts a lot of her "To do" tasks on her calendar and that it does not necessarily mean that she is in a meeting or away from her desk all of the time. Despite this explanation, Defendant Zernicke unnecessarily reprimanded Ms. Gregg.

50. On February 18, 2019, Ms. Gregg asked Defendant Zernicke for reasonable flexibility if she went over her one-hour lunch because of an unexpected delay at her medical appointments. She mentioned that her co-workers, who did not have medical conditions, to the best of her knowledge, were frequently allowed to go over their lunch hour without consequence and were provided flexibility.

51. In response, Defendant Zernicke told Ms. Gregg not to make comparisons with other people, penalized her for her medical conditions and medical leave requests,

7

and expressed that he felt it was a problem that she had "frequent and lengthy appointments and that there is a need to know that Ms. Gregg is available during 'business hours' ".

52. Defendant Zernicke then, in a public email, referred to Ms. Gregg's need to go to appointments as a "real medical challenge" while copying co-workers, Caitlin Hahn and Timothy Kenneally nonetheless. Ms. Gregg explained to him that she completed all of her work and that it would make more sense for her to make up those hours during the week like comp time as Defendant Zernicke had let her do in the past rather than using paid sick-time (as other employees are directed to do for appointments).

53. On or about February 19, 2019, for the first time, Defendant Zernicke demanded that he be granted full access to Ms. Gregg's calendar.

54. On February 20, 2019, Defendant Harding and Ms. Gregg met to discuss the email exchange she had with Defendant Zernicke. Defendant Harding improperly instructed Ms. Gregg that she should not compare herself with others unless she is speaking of inequity. Ms. Gregg said that was exactly what she was saying. Defendant Harding then told her that would require filing a different form and discouraged her from filing it.

55. Defendant Zernicke also requested that Ms. Gregg disclose the details of her private appointments. Ms. Gregg reiterated that she used her calendar as a reminder to do particular tasks and it did not necessarily mean that she was away from her desk.

56. Ms. Gregg also reminded him that due to him not being supportive of her appointments that she had reschedule them. He also referred to her medical needs as "special" which also made her uncomfortable.

57. He conveyed, by his words and his actions, that he was not in agreement with the ADA and FMLA accommodations she received. Defendant Zernicke also expressed surprise and skepticism that Ms. Gregg had as many medical appointments as she did.

58. Ms. Gregg subsequently emailed Defendant Harding to inquire whether she was required to tell Defendant Zernicke who she was meeting with even if it was a confidential internal meeting. She also asked if there were any policies and procedures that required her to share her Outlook calendar with her manager, especially since he had not asked for such access for over a year.

59. Defendant Harding also reviewed an email Ms. Gregg was preparing to write to Defendant Zernicke.  Ms. Gregg expressed to her that she felt that Defendant Zernicke wanted to know her every move. Ms. Gregg also explained to her that she was also required reschedule important medical appointments because of his conduct.

60. She also explained to her that over the last few months, he had continued to probe her with questions as to how she got so many medical appointments since in his experience, it can be hard getting medical appointments so quickly.

8

61. Defendant Harding told Ms. Gregg that she did not think it looked good that Defendant Zernicke gave her a "mentor" and told her that she "felt like something big is coming". She did not elaborate, but termination seemed implied to Ms. Gregg. Ms. Gregg did not understand at the time why it would make her look bad to have a mentor. Despite this, Defendant Harding made no effort to meaningfully assist Ms. Gregg.

62. On February 19, 2019, Defendant Shea messaged Ms. Gregg to let her know that according to how her doctor wrote her FMLA leave request, with her having a total of five episodes per month, an episode was considered 1-7 hours.   She explained that if she only "take[s] 3 hours of FMLA then 3 hours of FMLA would  be deducted" from her total. Ms. Gregg was also told that," the 3 hours are considered 1 episode". This seemed odd to Ms. Gregg and unfair as she would be losing time that she had not actually used. This also did not account for needing separate appointments during work hours with the separate protection for taking a sick day.

63. On February 19, 2019, Ms. Gregg submitted her self-assessment to Defendant Zernicke and set up a meeting to discuss it, but he declined and said he did not think it was necessary for him to discuss it with her, unlike her other colleagues who had met with him.

64. On February 20, 2019, Ms. Gregg told Defendant Shea that she would have her doctor make adjustments to the FMLA leave request and that she would resubmit it.

65. On February 20, 2019, after working with Defendant Harding on her draft to Defendant Zernicke, Ms. Gregg reluctantly sent him the email complying to give him access to her calendar.

66. On February 25, 2019, Ms. Gregg let Ms. Iva Caridha and Defendant Shea know that she would be sending another FMLA form which more specifically addressed her medical needs.

67. On March 4, 2019, Ms. Gregg spoke with Mr. John Armendariz, one of Defendant Northeastern's employees who handled issues relating to accommodation requests under the ADA about her requests for flexible time, the option to work from home, and her request for a headset. She sent her ADA request form to him with the reminder of previous discussions on the topics. She also informed him that upon receiving her diagnosis around April of 2018 that she had since stopped relaying details to her supervisor about her medical conditions.

68. During March 5-7, 2019, Mr. Armendariz sent Ms. Gregg an email with Defendant Zernicke included informing Defendant Zernicke that her requests for ADA appeared to be "reasonable requests and supported by the documentation".

69. He suggested that Defendant Zernicke and Ms. Gregg have a discussion about this. Defendant Zernicke told Ms. Gregg in person that even though Mr. Armendariz believes its reasonable that he did not think so as she needed to be "in the office during standard business hours".

9

70. Ms. Gregg informed Mr. Armendariz that she spoke with Defendant Zernicke in his office and that Defendant Zernicke also told her, in denigrating fashion, that he had "more pressing concerns" than her request. Mr. Armendariz said he was going to have her wait until about March 18, 2019 to have a conversation with Defendant Zernicke and that he would be speaking with HR in regards to setting a policy around her lunch hour. Mr. Armendariz then introduced Ms. Gregg to the Ombudsman, Diane Levine to address her concerns.

71. On March 11, 2019, Ms. Gregg asked Defendant Shea if she needed to request the FMLA PTO time off instead of waiting for that week to do so and she said if that is what Defendant Zernicke requests, she must comply.

72. Yet in future emails, Defendant Shea scolded her if she utilized her PTO option. Defendant Shea often gave her either none, very little or many confusing, contradictory and inconsistent instructions regarding her FMLA leave and her FMLA rights during her tenure.

73. On March 11, 2019, Ms. Gregg scheduled a March 20, 2019 meeting with Ms Levine, the Ombudsman, in preparation for discussing ADA and FMLA flexibility with Defendant Zernicke since he had expressed to Ms. Gregg that he did not like the idea of it.

74. On March 12, 2019, Ms. Gregg asked Mr. Armendariz if she needed to let Defendant Zernicke know about her meeting with Ms. Levine, and he said "no". She also let him know that she did not believe she would receive Defendant Zernicke's support for her need for accommodations as he had adversely treated her exercise of her FMLA rights.

75. As Ms. Levine could not meet her until after Ms. Gregg was scheduled to have this discussion with Defendant Zernicke, Mr. Armendariz suggested that she reschedule with Defendant Zernicke so that she could talk with Ms. Levine first and receive advice on how to approach the conversation with Defendant Zernicke. She then rescheduled the meeting with Defendant Zernicke.

76. Meanwhile, on March 12, 2019, Ms. Gregg reached out to Defendant Shea to inform her that she tried entering in 30 minutes of FMLA time and 6 in a half hour that were worked. For some reason the Time Tracker system did not allow her or Ms. Hahn to enter it in. Ms. Gregg then asked Defendant Shea for a better way of entering it in. Ms. Gregg also let her know that Ms. Hahn tried to accommodate this by changing around the time since Ms. Gregg was having that Wednesday off for FMLA purposes. She informed her that this would not reflect data integrity. Ms Gregg then told her that Ms. Hahn was the one who suggested this and that she should take that up with her directly. Ms. Gregg also pointed out that the system was not accurately depicting the integrity of the time and improperly deducting FMLA time Ms. Gregg was entitled to, but had not yet used.

77. Ms. Gregg pointed out that the system would make employees choose more time than what was actually taken because of the system's inability to do increments lower than an hour. Ms. Gregg also let her know that in preparation for the FMLA

appointment she had added the comment into the time tracker earlier. Ms. Hahn then informed her that she "does not accept future dated FMLA time off".

78. Ms. Gregg also told her that she was aware of this and that she was only trying to be organized and prepared since she had not yet submitted her timesheet at that point. In response to updating him about these events with him, Defendant Zernicke then called her unprofessional and antagonizing.

79. Ms. Gregg then explained to Defendants Zernicke and Shea that it can be confusing for her manager to all of a sudden send reminders for her to enter things into the Time Tracker and then be scolded for doing so with organization in mind from Defendant Shea. This also resulted in Defendant Harding requesting that they have a meeting to discuss the email exchange on this issue.

80. On or about March 10, 2019, Ms. Gregg and Defendant Shea discussed via email Defendant Shea's research on the FMLA law and time tracking for it.

81. On March 12, 2019, Ms. Gregg asked Defendant Zernicke if she could go to the African American Institute D.R.E.A.M. Conference for people of color at the university. When she asked him in person, he told her that he did not see the relevance of this conference to her and declined the request. Ms. Gregg had informed him via email, however, that this was a professional development opportunity important to her as a woman of color. Defendant Zernicke, however, did not change his mind and Ms. Gregg was precluded from attending until she took action through third parties involved with either the Ombudsman or Equity and Compliance offices.

82. On March 14-15, 2019, Ms. Gregg went to the Case District I Conference in Boston and not the preconference like some of her coworkers, such as Ms. Abigail Smith, a Caucasian female who had not requested FMLA intermittent leave. Ms. Smith was able to go to the preconference and conference from March 13-15, 2019 using Defendant Northeastern's budget money instead of applying for the scholarship as Ms. Gregg was required to do.

83. Ms. Smith used to work under Defendant Zernicke when he was the Interim Assistant Dean at D'Amore-Mckim School of Business ("DAMSB"). Ms. Smith is a younger white female who started employment with Defendant Northeastern after Ms. Gregg did, and also received a promotion, unlike Ms. Gregg.

84. On March 18-19, 2019, an Internal Performance Appraisal was emailed to Ms. Gregg for her to look at and schedule a meeting. This was also the same day (the 19th) that Defendant Zernicke had schedule their ADA conference. Indeed, Defendant Zernicke had prioritized writing performance reviews over reviewing Ms. Gregg's medical needs and accommodation requests.

85. As a result of the Defendants' delay, Ms. Gregg was prevented from having the time to discuss ADA and how to approach it with the Ombudsman first, Ms. Levine.

86. Ms. Gregg also called Mr. Andy Graves, HR Business Partner (Defendant Harding's reportee), who Mark Janonni of Equity and Compliance "vouched for",

11

and told him that Defendant Zernicke was rejecting her reasonable accommodation requests. This caused Ms. Gregg significant distress and neither she nor Mr. Graves understood his decision to reject her requests.

87. On March 18, 2019, Defendant Zernicke requested that Ms. Gregg, unlike other employees, write a summary of her experience at the CASE conference. Ms. Gregg did this and also asked to see when he would like to discuss with her what she had written. Following this, Defendant Zernicke even criticized her summary and the specific conference sessions which Ms. Gregg had chosen.

88. On March 19, 2019, because Defendant Zernicke had expressed concerns with her attending training sessions even during her lunch hour, Ms. Gregg asked him if she could attend the five (5) training sessions for professional development. In response, Defendant Zernicke insisted on selecting the training sessions she could attend, even though she participated in them during her own lunch hour.

89. On March 21, 2019, Ms. Gregg and Ms. Levine, had a meeting to discuss her upcoming performance review meeting with Defendant Zernicke. She told Ms. Gregg what she wrote was professional and well worded.

90. On March 21, 2019, Defendant Zernicke and Ms. Gregg had a performance review meeting. Ms. Gregg disagreed with Defendant Zernicke's unfair and inaccurate review and consequently, she prepared a four page rebuttal to it.

91. Indeed, Defendant Zernicke misrepresented the work Ms. Gregg performed, such as not accurately representing her work for four people at a time, which exceeded the duties listed in her job description. When she pointed this out to him, he said, in degrading fashion, "that would depend on what one would call work".

92. Defendant Zernicke also omitted the leadership Ms. Gregg demonstrated with another student employee. He also told her that he found it counterproductive to discuss what she had written in her self-assessment. He also explained that what he wrote was not to be negotiated and told her that her use of her FMLA time during lunch was a problem for him.

93. On March 22, 2019, Ms. Gregg asked Defendant Shea whether it was permissible to use her lunch for a medical appointment and whether it was necessary to notify her if her appointment went over and her use of FMLA time for that overage was necessary. Defendant Shea responded on March 23, 2019 to tell her that the issue needed "to be worked out with your manager based on the needs of your department and manager".

94. Ms. Gregg then asked Defendant Zernicke about this matter but he continued to delay providing his response to Ms. Gregg's inquiry. He also told her that he was working with HR to change the flexibility of what time her lunch hour was taken in yet another adverse action against her.

95. Meanwhile, Defendant Shea confirmed that Ms. Gregg could use her lunch hour for "whatever they choose (eating, shopping) including an appointment while staying within the lunchtime parameter." Ms. Gregg told her on or about March 26,

2019 that she had never received "a scheduled lunch parameter " nor was she aware of any other employee who had such a parameter.

96. Defendant Shea then told her that she would need to discuss her scheduled lunch time with Defendant Zernicke, even though there has never been a scheduled lunch time.

97. On March 26, 2019, Ms. Gregg set up a confidential informational interview with Ms. Sybil Solis, another HR Business Partner of HR, for March 28, 2019, who then later referred her to Mr. Stephen Rando to do another confidential informational interview regarding available positions within this department.

98. On March 26, 2019, Ms. Gregg learned from her coworker, Ms. Sophie Bolton, who has a different manager (and who had not requested FMLA leave), Ms. Lea Bushnell, that Ms. Bolton was allowed to work from home due to snow. Ms. Gregg, however, was not allowed to do so by Defendant Zernicke. He told her that she could not revisit the topic until after her "trial," as Defendant Zernicke called it, from the 1st of April up to September 2019.

99. During this time, Defendant Zernicke kept probing Ms. Gregg with questions in person asking her why she felt that she needed her FMLA leave, her accommodations and what her symptoms were. He would say to her in an accusatory tone, "I have two family members with [medical condition] and doesn't it eventually stop at some point?"

100. Feeling pressure, Ms. Gregg relented and explained to him that she needed it for fatigue. She did not provide further details about her medical conditions as it was her personal, private medical information and she was fearful of his further denigrating comments.

101. On March 29, 2019 and on April 1, 2019, Ms. Gregg asked Ms. Caridha and Defendant Shea questions regarding her FMLA request and notified them that she had attached two more FMLA forms from one other specialist (her rheumatologist) and her primary care doctor. She did not receive any information on the status of her attending appointments that week and was advised that she needed to wait. On April 1, 2019, Defendant Zernicke then sent an email to Ms. Gregg, while copying Luanne Kirwin, Timothy Kenneally, Defendant Shea, and Mr. Armendariz, advising Ms. Gregg that they will "commence a trial period of April 1st 2019-September 1st , 2019 regarding her medical accommodation requests.

102. Although Ms. Gregg's pay raise had been approved two months earlier, she never received it. On April 1, 2019, Ms. Hahn, informed her that they had just noticed that the increase had not been processed and that they would be providing her with a retroactive lump sum of what she was owed.

103. On April 1, 2019, Ms. Hahn and Ms. Amanda Donovan looked into the time tracker issue of not displaying increments for FMLA leave in an attempt to accurately reflect the hours Ms. Gregg did or did not work. In response, Defendant Shea said this effort did "not reflect data integrity." Ms. Gregg informed her that this was not initiated by her, but by Ms. Hahn.

104. On April 8, 2019, Ms. Gregg emailed Defendant Shea and explained that with respect to her FMLA request, Ms. Gregg's loss of hours on the time tracking system did not seem fair to her or other employees taking FMLA leave. Ms. Gregg explained that only the amount of FMLA leave actually taken should be deducted and nothing more.

105. On April 10, 2019, Ms. Gregg met with Defendant Shea and her assistant, Ms. Caridha, to review her questions. Defendant Shea for the first time said that there was missing information on Ms. Gregg's FMLA forms and also told her that only one "gatekeeper" or medical provider should complete her FMLA paperwork.

106. She also threatened Ms. Gregg multiple times in this meeting that she could call her doctor to clarify information in the FMLA if she or Defendant Zernicke felt that she was abusing her FMLA. For this reason, she requested that Ms. Gregg list out all of her specialists and the duration of these meetings and how many times per month she would be seeing them. Ms. Gregg told her she could only give her an approximation. Defendant Zernicke had also insisted that he could speak with her doctor, but Ms. Gregg advised him that was not ethical and improper. Defendant Shea also continued to speak to Ms. Gregg as if she knew about her condition already and what she would be needing as her "diagnosis progresses". This made Ms. Gregg uncomfortable as she was imposing her own personal opinions onto Ms. Gregg.

107. On April 10, 2019, Ms. Gregg sent Defendant Zernicke an email letting him know that she had an appointment that would require her to be out all day on the 30th of April. She informed him that she asked Defendant Shea about how she should designate this PTO and FMLA in the time tracker and that she was informed to use sick time.

108. She then followed up with Defendant Zernicke from this email in person to let him know and then improperly asked her if she had told Defendant Shea, and when she said yes, he laughed and said, " Well, doesn't she get ticked off when you give her notice in advance?"

109. On April 11-12, 2019, Defendant Shea said in an email that Ms. Gregg never informed her that she would be sending multiple FMLA forms, but Ms. Gregg had in fact done so on multiple occasions during the previous months. Ms. Gregg and her doctors had worked hard in completing all the necessary paperwork, and had Defendant Shea indicated her preference previously, such effort would not have been expended unnecessarily.

110. On April 19, 2019, Ms. Gregg spoke with Mr. Jannoni about her feelings that she was being treated adversely and retaliated against from both her manager, Defendant Zernicke, and HR, and set up a meeting with Mr. Graves for the following week to discuss her concerns.

111. Ms. Gregg was concerned that she was being treated adversely from her colleagues as a result of her use of FMLA leave.

14

112. On April 25, 2019, Ms. Gregg was then subjected to an uncomfortable conversation with Defendant Zernicke in his office who again accused Ms. Gregg of abusing her FMLA leave. She refuted this allegation verbally and also in email. Indeed, Defendant Zernicke did not allow her to finish her statements, requiring her to complete her statements via email. He then accused her of being unprofessional and counterproductive:

From: Zernicke, Paul
Sent: Thursday, April 25, 2019 9:44 AM
To: Gregg, Simone <s.gregg@northeastern.edu>
Subject: RE: Recent Conversation

Hi Simone,
I think it unprofessional and counterproductive to belabor matters like this on email. Let us respect the boundaries and purpose of the ADA accommodations we discussed—that as needed due to your medical condition (not as a premeditated work strategy) you may leave an hour early and make up the time the following day. Your lunch hour is not a portable component of/or to be used in combination with the ADA action we agreed to. Obviously, if you are not feeling well enough to work at all, then you should employ sick day/personal time. Fortunately, it sounds like that is where you
too landed. Thanks.

Best, Paul
Paul Haskell Zernicke, Ph.D.
Associate Vice President for Development │ Northeastern University
716 Columbus Avenue, 402 CP, Boston, MA 02120
T: 617.373.8367 │ M: 617-849.2764 │ p.zernicke@neu.edu

113. Ms. Gregg was so upset by her interaction with Defendant Zernicke that she reached out to Ms. Levine who then referred her to Mr. Jannoni. Ms. Gregg spoke with him and he set up a time to speak. Ms. Gregg met with Mr. Graves to discuss her email and he stated he did not find anything wrong with what she had written and indicated it was professional. He advised her that she not respond back to Defendant Zernicke.

114. On April 25, 26 and 29, 2019, despite receiving approval from Defendant Zernicke, Ms. Gregg felt uncomfortable using her FMLA time because of Defendant Zernicke continuously questioning her and accusing her of alleged misuse. Ms. Gregg even emailed Mr. Armendariz to ask him if she was free to use her flexible time accommodation when she needed to as she told him she felt prevented from doing so by her boss. No substantive assistance, however, was provided to Ms. Gregg.

115. On April 26 & 29, 2019, Ms. Gregg emailed Mr. Jannoni again to address her concerns regarding her challenges in using FMLA time and her request for an informal investigation. Ms. Gregg was advised to speak with Ms. Brigid Molloy, an investigator with Defendant Northeastern's Office for University Equity and Compliance ("OUEC").

116. After discussing her challenges with Defendants Shea and Zernicke, Ms. Molloy seemed to disagree with Defendant Zernicke's and Shea's behavior. She said that her own boss does not need to know the specific details of her own calendar and that Ms. Gregg had the right to not show specific details. She informed Ms. Gregg that she would be meeting with Defendants Zernicke and Shea (separately) to tell them about the informal investigation and to get their side of things. She asked Ms. Gregg to write ways that both Defendant Zernicke and HR could make the situation better for their next meeting.

117. On May 2, 2019, Defendant Shea failed to respond to Ms. Gregg's email asking if her PTO would accrue by the new fiscal year. She then had to ask Ms. Hahn instead, who confirmed that it would on May 3, 2019.

118. On May 3, 2019, Ms. Gregg learned that Ms. Jennifer Trapp's college (Health Sciences) sent employees information on flex-time guidelines, which Ms. Gregg's department did not have.

119. On May 8, 2019, Ms. Gregg met with Ms. Molloy in person to discuss next steps of the informal investigation. Ms. Gregg met with her and told her what she proposed for how Defendant Zernicke and HR could do to improve the situation. Ms. Molloy, however, was not as receptive to Ms. Gregg's proposal or situation, as she had been originally when they had first met. Ms. Gregg observed this change in her approach to Ms. Gregg after Defendant Zernicke had met with Ms. Molloy.

120. On May 13-14,2019, Ms. Molloy made it stressful and uncomfortable for Ms. Gregg when she told her that she did not understand her need for private appointments even though in their prior meeting Ms. Gregg expressed her understanding of Ms. Gregg's position.

121. On May 10 & 17, 2019, Ms. Gregg and Ms. Molloy had a phone conversation. Ms. Molloy created a memorandum of agreement of terms for Defendant Zernicke and Ms. Gregg to implement and agree to and assist them with their interactions.

122. On May 20, 2019, Ms. Gregg emailed Ms. Molloy and asked her why she would need to disclose details on her lunch break and Ms. Molloy indicated that Ms. Gregg could keep things like this on a personal calendar or on her phone only.

123. On May 21, 2019, Ms. Molloy and Ms. Gregg had a confidential phone meeting to address Ms. Gregg's concerns about Defendant Zernicke's treatment of her.  On May 21, 2019, Ms. Gregg also spoke with Mr. Graves about  these concerns and whether or not she was being paid fairly.

124. On May 22, 2019, Ms. Stacey Pierce contacted Ms. Gregg to schedule a phone interview for May 29, 2019.  This interview was held and Ms. Gregg was soon invited for a second interview in person to meet colleagues on Ms. Pierce's team.

125. On May 23, 2019, Ms. Molloy emailed Ms. Gregg a summary of the informal investigation with Defendant Harding and Defendant Shea (HR), but did not produce a document of an agreement as had been suggested to Ms. Gregg.

126. On May 24, 2019, Ms. Gregg informed Defendant Zernicke that she would be out on June 3rd-4th and June 17th-18th for FMLA purposes.

127. On May 28, 2019, Ms. Gregg gave Defendant Shea the most recently updated FMLA form for her to process.

128. On May 29, 2019, Ms. Gregg was trying to determine how she should approach logging in her FMLA time now that she had exhausted her "sick bank" time. Defendant Shea did not properly assist Ms. Gregg with this process and as a result, this unnecessarily complicated Ms. Gregg's FMLA process further.

129. On May 30, 2019, Ms. Pierce emailed Ms. Gregg to tell her she made it to the next stage for an interview in person. She went to the interview at the Office of the Chancellor's HR office and met with Ms. Pierce, Director of Employee Engagement & Experience - Office of the Chancellor, Ms. Amy Molway, Senior Director of Employee Engagement & Experience-Office of the Chancellor, Ms. Tamara Noel, HR Manager, Enrollment Management- Office of the Chancellor, and Ms. Sarah Russo, HR Coordinator-Office of the Chancellor. The interview was scheduled for June 10th, 2019.

130. On May 30, 2019, Ms. Gregg has informed Mr. Kenneally that since around November of 2018, she had noticed people had been at her cubicle area after work hours  and it had also appeared that people had attempted to access her computer. Chairs were moved in a particular position that suggested two people were trying to use the computer, and Ms. Gregg's whiteboard had markers removed, as well as adjustments to a heater. A police officer, Mr. Mike Monaco eventually became involved after Ms. Gregg's inquiry.  After Ms. Gregg's vacation, she was told by Mr. Monaco that the investigation could not identify anyone using their login on her computer, but also could not rule out the possibility that  employees had attempted to access her computer.

131. On May 31, 2019, Ms. Gregg contacted Ms. Molloy and asked for clarification as to what Defendant Harding had meant when she told her she " felt something big coming".

132. On or about May 29, 2019 through June 3, 2019, Ms. Gregg submitted her final FMLA paperwork signed by her rheumatologist to Defendant Shea. As Ms. Gregg explained to Defendant Shea, this had required additional work from Ms. Gregg because of Defendant Shea's delay and the numerous mistakes made by Defendant Shea during the process.  Defendant Shea had threatened Ms. Gregg that if she had not completed this additional paperwork within a seven day period, Ms. Gregg's FMLA request would be denied.

133. On June 7, 2019, as Ms. Gregg had exhausted her sick time PTO, she emailed Defendant Shea asking her to let her know when she approved her FMLA time so that Ms. Gregg could ensure that her FMLA time was processed correctly.

134. On June 7, 2019, Defendant Shea and her assistant sent Ms. Gregg an approval detailing her revised intermittent FMLA leave letter.

135. On June 10, 2019, Ms. Gregg interviewed with Ms. Pierce and her colleagues. The interview went very well as she made it to the next stage of the hiring process - the reference check verification stage.

136. That same day, on June 10, 2019, Defendant Zernicke emailed Ms. Gregg asking her to report to him her hours worked for the day which he had never done before. Ms. Gregg complied.

137. On June 12, 2019, Ms. Gregg emailed Defendant Zernicke as she usually did to inform him of her plans to use her flextime. Defendant Zernicke responded asking her for a progress report/update on completed tasks. This was the first time he had requested this type of report, causing Ms. Gregg to inquire if this was required because of her recent FMLA leave approval, which had been approved just days earlier.

138. On June 12, 2019, Ms. Gregg asked Mr. Jannoni if there was an alternative contact that she could reach out to if she did not feel comfortable speaking with Defendant Shea.  He informed her that she could reach out to Defendant Shea's assistant with questions.

139. On June 12, 2019, Defendant Shea confirmed that Ms. Gregg would be losing time that she did not actually take towards PTO/FMLA leave in the tracking system because the tracking software continued to prevent increment deductions until after the first hour.

140. On June 14, 2019, Ms. Pierce told Ms. Gregg that she would need to contact her current manager as part of the policy for internal applicants and told her she would give her time to tell her manager that she had applied for the position.

141. In response, Ms. Gregg went into Defendant Zernicke's office to let him know that she had applied for this internal position and that they would be contacting him as a reference. After leaving his office, he then called her back in to ask her how far into the process she was in; that is, if she had got the job offer or if it was the reference check.

142. After Ms. Gregg confirmed again that it was the reference check, he then told her he would need to talk to them about her "attitude and performance." Ms. Gregg then mentioned that she believed it would be illegal to give her a bad reference. He then continued to say "it depends on what one would call a bad reference".

143. Upon learning of this troubling information, Ms. Gregg immediately called and emailed Mr. Jannoni (and later spoke with him on the phone) to inform him of what Defendant Zernicke told her about his "reference". He suggested that Defendant Zernicke would be retaliating against her by giving her a bad reference. This in particular caused Ms. Gregg significant emotional distress and resulted in a panic attack.  Indeed, Ms. Gregg suffered numerous panic attacks during her tenure under Defendant Zernicke.

144. Mr. Jannoni then let Ms. Gregg know that if Defendant Zernicke gave a negative reference to Ms. Pierce as he had threatened to do, this would not be appropriate

18

and would look like retaliation.

145. On June 17, 2019, Ms. Gregg also informed Ms. Pierce that she had informed her manager of her job prospect.

146. Ms. Gregg then learned on June, 18, 2019 from Ms. Pierce that she had hired another applicant for the position. Ms. Gregg's fears of losing the job offer following Defendant Zernicke's communication with Ms. Peirce then came to fruition.

147. On June 19, 2019, Defendant Zernicke subjected Ms. Gregg to further unfounded criticism via an email exchange.

148. On June 24, 2019, Ms. Gregg received news that her raise was significantly decreased from the previous year. Although Ms. Gregg received this news via a letter dated June 18, 2019, it was not sent out to Ms. Gregg until June 24, 2019.

149. On or about June 24-25, 2019, Ms. Gregg spoke with Mr. Jannoni about moving forward with the formal investigation and being assigned a different investigator. He informed her that this process could start while she was on vacation.

150. On June 26, 2019, Ms. Gregg let Mr. Jannoni know that she had a witness who would like to speak about her experiences working for Defendant Zernicke. She also asked him about the anonymous process for witnesses who would like to remain discreet.

151. On June 27, 2019, Mr. Jannoni informed Ms. Gregg that he would be assigning her claim to Ms. Diana Fitzgerald, OUEC Investigator, for the formal investigation. Ms. Gregg also told him that a colleague suggested they contact Mr. Kennealy for reports made by other colleagues against Defendant Zernicke.

152. During July 1-21, 2019, Ms. Gregg took a much-needed vacation in an effort to improve her health given the exacerbation of her medical conditions during her employment. While she was away on vacation, the formal investigation began into Ms. Gregg's concerns regarding mistreatment, which sought to address her treatment in the workplace as well as in the classroom at Defendant Northeastern. Then, on July 22, 2019, at her first day back at work and  two hours into the job, Ms. Gregg received an email from Defendant Zernicke listing out his expectations for her. Defendant Zernicke also informed Ms. Gregg that she would no longer be receiving her mentorship opportunity. This email caused Ms. Gregg significant emotional distress and resulted in her experiencing another panic  attack and severe physical pain.

153. On July 24, 2019, Ms. Gregg had a meeting with Defendant Zernicke and he stated that he did not want to come off negative, but that in their email exchanges the day before (regarding a direct reports contact list), Ms. Gregg acted as if she was his boss and not the other way around. He said that Ms. Gregg displayed a negative tone in their email exchanges when she asked him for specific names.  He told her that if he has to talk to her about her tone again, there would be disciplinary actions.  Ms. Gregg then reported upsetting event to Defendant Fitzgerald as follows:

From: Gregg, Simone
Sent: Wednesday, July 24, 2019 10:13 AM
To: Fitzgerald, Diana <d.fitzgerald@northeastern.edu>
Subject: RE: RE:
Hi Diana,

I had a meeting with Paul and as I always do this I created a planned agenda and asked him if he wanted me to add anything else. He didn't, but when we started our meeting he started to discuss something that was not on our agenda and accused me of having a negative tone in our email exchanges yesterday. He also implied that it sounded like I was his boss instead of the other way around which is not the case. As I told him this was not my intention and I was really just looking for clarity which he unfortunately did not give as he was trying to seem like he did during out meeting today. He told me that if he has to talk to me about my tone again there would be disciplinary actions. Since Monday I've felt nothing, but retaliation from him since being back from vacation and since him knowing about the formal investigation against him. Would you have time to discuss this matter today, please? I would be happy to send you the email exchanges.

Best,
Simone

154. Ms. Gregg informed Ms. Levine that she was given a small merit raise in comparison to last year and she felt this was another form of retaliation from Defendant Zernicke. Ms. Gregg gave her the agenda where she had highlighted her contributions to Defendant Zernicke in asking for a raise earlier that year.

155. On July 24, 2019, Defendant Zernicke gave Ms. Gregg another task where his deadline was not realistic. He asked her for a report that would require her to use the Maptive program, when her training on that program had not yet been completed and when such training was not available until the following week.

156. Ms. Gregg informed Defendant Zernicke of this development, but he was not receptive.

157. On July 26, 2019, Ms. Gregg informed Ms. Hahn that her paycheck for June 28, 2019 did not reflect the extra $250.00 overtime compensation she was owed.

158. Defendant Zernicke's exclusion of Ms. Gregg from the department also continued as he failed to share new staff hires with Ms. Gregg and failed to include her in planned summer retreats. This caused Ms. Gregg further m emotional distress.

159. On July 31, 2019, Defendant Zernicke's micromanagement of Ms. Gregg also continued in escalating and distressing fashion. Defendant Zernicke repeatedly contacted Ms. Gregg about his expectations of a weekly "itemized listing of projects and deadlines and then a Friday summary." He also advised Ms. Gregg that she had not completed an assignment when Ms. Gregg had in fact done so.

160. On July 31, 2019, Ms. Gregg submitted a tuition waiver request form to Defendant Zernicke for him to approve. Defendants, however, did not allow Ms. Gregg's reimbursement at this time.

161. On July 31, 2019, after reporting recent developments about her medical condition to her doctor, Ms. Gregg's medical provider recommended that she take an immediate medical leave.

162. Before requesting this leave, Ms. Gregg asked Defendant Shea if her job would be protected, but Defendant Shea gave her no assurances.

163. On August 1, 2019, Ms. Hahn sent Ms. Gregg her personnel record, but it was incomplete as it did not include her self-assessments or job description.

164. After returning from her leave, on August 6, 2019 Defendant Zernicke denied another request by Ms. Gregg to attend a training webinar, citing her "underperformance" as justification. He also said that because she was in school (despite that being a benefit to every full time employee), that that should basically be enough.

165. On August 8, 2019, Defendant Fitzgerald sent Ms. Gregg the findings of the formal investigation conducted into Defendant Zernicke and HR's actions, which did not find any fault with Defendant Zernicke's conduct. Ms. Gregg expressed her disagreement with their findings and requested that Defendant Fitzgerald reopen the case as they told her that could be done with the "new" information, but they refused to do so. Ms. Gregg also asked if they could confirm whether they received the reports against Defendant Zernicke from Mr. Kenneally and they would not disclose that, claiming that information was confidential.

166. Ms. Gregg, believing that the intolerable conditions in her workplace would not improve and that her health would continue to deteriorate. Left with no other choice, she was constructive discharged and resigned from Defendant Northeastern on August 8, 2019.

## COUNT ONE

### VIOLATION OF FAMILY MEDICAL LEAVE
### ACT- 29 U.S.C. § 2614(a) and 29 U.S.C § 2615(a)(l)

167. Paragraphs 1 through 166 of this Complaint are repeated and incorporated as though fully set forth herein.

168. Defendant Northeastern was at all relevant times and is an "employer" as defined in 29 U.S.C. §2611(4), as Northeastern employed more than fifty employees within a seventy-five mile radius for each working day during each of twenty or more calendar work weeks in the current and preceding calendar years.

169. Plaintiff was at all relevant times an "eligible employee" as defined in the 29

U.S.C. § 2611(2)1; had not exhausted her allotment of twelve weeks of FMLA Leave during a twelve-month period; and had worked the requisite twelve months prior to her FMLA requests.

170. Plaintiff had a serious health condition under 29 U.S.C. §2611(11) and 29 C.F.R. §825.113.

171. Plaintiff was entitled under the FMLA up to twelve (12) work-weeks of leave for her serious health condition, which could be used intermittently or on a reduced leave basis and which leave was medically necessary, under 29 U.S.C. §§ 2612(a)(l)(C) and (D) and § 2612(b)(l).

172. The Defendants' threats, disciplinary actions, salary reductions, and constructive termination by forcing her to resign, interfered with her FMLA rights and constitutes violations of the FMLA including, but not limited to, violations of 29 U.S.C. § 2615(a)(l) and its implementing regulations 29 C.F.R. §§ 825.220(a) and (b).

173. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT TWO

### VIOLATION OF FAMILY MEDICAL LEAVE
### ACT- 29 U.S.C § 2615(a)(2)

174. Paragraphs 1 through 173 of this Complaint are repeated and incorporated as though fully set forth herein.

175. The Defendants' disciplinary actions, adverse actions, and constructive termination were willful and were in retaliation of her request for intermittent FMLA leave in violation of 29 U.S.C. § 2615(a)(2) and its implementing regulations.

176. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT THREE

### INTENTIONAL INTERFERENCE WITH
### CONTRACTUAL/ADVANTANEGOUS RELATIONS

177. The Plaintiff refers to the allegations of Paragraphs 1 through 176, and by such reference repleads and incorporates them as though fully set for here.

178. At all times relevant, Defendants Zernicke, Harding, Fitzgerald, and Shea were employed by Defendant Northeastern.

179. Defendants Zernicke, Harding, Fitzgerald, and Shea intentionally interfered with the

22

Plaintiff's employment by retaliating against her following her medical leave, use of FMLA leave and following her requests for investigations and internal complaints.

180. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## COUNT FOUR

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181. The Plaintiff refers to the allegations of Paragraphs 1 through 180, and by such reference repleads and incorporates them as though fully set forth here.

180. At all times relevant, Defendant Zernicke was employed by Defendant Northeastern and served as the Plaintiff's supervisor during her tenure.

181. Defendant Zernicke intentionally inflicted emotional distress upon the Plaintiff as he knew or should have known that his actions would cause her or caused her emotional distress.

182. As a result thereof, the Plaintiff has suffered damages including, but not limited to, lost wages, back pay, front pay, and emotional damages.

## <u>RELIEF REQUESTED</u>

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

a) Award the Plaintiff money damages pursuant to 29 U.S.C. § 2617, amounting to twice the back wages owed her as a result of the Defendant's actions and failure to act; in addition to the value of her lost employment benefits and any other lost compensation (plus interest on the total);

b) Award the Plaintiff damages including but not limited to: compensatory damages, damages for emotional distress, pain and suffering, damages for humiliation, consequential damages, back pay, front pay, lost employment benefits, lost opportunity, and punitive damages;

c) Grant the costs of maintaining her action, including costs and reasonable attorneys' fees and pre-judgment interest; and

d) Grant such other and further relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY ON ALL CLAIMS SO TRIABLE**

    i. That actual damages be awarded to the Plaintiff;

    ii. That compensatory damages be awarded to the Plaintiff;

   iii. That punitive damages be assessed against the Defendants;

   iv. That the Plaintiff be awarded the costs of this action;

    v. Reasonable attorney's fees; and

   vi. Such other and further relief as the court may deem necessary and proper.

Respectfully submitted,
Plaintiff,
SIMONE GREGG
By her attorney,


/s/ *Helen G. Litsas*


Helen G. Litsas
BBO#644848
**LAW OFFICE OF HELEN G. LITSAS**
22 Mill Street, Suite 408
Arlington, MA  02476
(781) 646-1518
(781) 643-1126
helen@litsaslaw.com

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| | | COUNTY Suffolk Superior Court (Boston) |

| Plaintiff | Simone Gregg | Defendant: | Northeastern University, Paul Zernicke, Maryellen Shea, Alexis Harding, Diana Fitzgerald, and Brigid Molloy |
|---|---|---|---|
| ADDRESS: | 1 Fenwick Place | ADDRESS: | Ralph C. Martin, III |
| Roxbury, MA 02119 | | 360 Huntington Avenue ► ( 301 CP | |
| | | Boston, MA 02115 | |
| Plaintiff Attorney: | Helen G. Litsas | Defendant Attorney: | |
| ADDRESS: | 22 Mill Street, Suite 408 | ADDRESS: | |
| Arlington, MA 02476 | | | |
| | | | |
| BBO: | 644848 | BBO: | |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AO4 | Employment Contract | F | ☒ YES ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?       Is there a class action under Mass. R. Civ. P. 23?
☐ YES ☐ NO       ☐ YES ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS

A. Documented medical expenses to date

   1. Total hospital expenses

   2. Total doctor expenses     **7/7/2021**

   3. Total chiropractic expenses

   4. Total physical therapy expenses

   5. Total other expenses (describe below)

                                   Subtotal (1-5):   **$0.00**

B. Documented lost wages and compensation to date        **$75,000.00**

C. Documented property damages to date

D. Reasonably anticipated future medical and hospital expenses

E. Reasonably anticipated lost wages        **$75,000.00**

F. Other documented items of damages (describe below)

                                   TOTAL (A-F):   **$150,000.00**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendants' unlawful conduct involved retaliatory conduct against the Plaintiff's FMLA rights, interfered with her employment and caused monetary loss and emotional distress damages.

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

| Signature of Attorney/Unrepresented Plaintiff: X   /s/ Helen G. Litsas | Date: 7/6/2021 |
|---|---|

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney/Unrepresented Plaintiff: X   /s/ Helen G. Litsas | Date: 7/6/2021 |
|---|---|

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2184CV01533 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Gregg, Simone vs. Northeastern University et al | Michael Joseph Donovan, Clerk of Court |
|---|---|

| TO: Helen G Litsas, Esq. Law Office of Helen G. Litsas 22 Mill St Suite 408 Arlington, MA 02476 | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |
|---|---|

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                                          DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 10/05/2021 | |
| Response to the complaint filed (also see MRCP 12) | | 11/04/2021 | |
| All motions under MRCP 12, 19, and 20 | 11/04/2021 | 12/06/2021 | 01/03/2022 |
| All motions under MRCP 15 | 11/04/2021 | 12/06/2021 | 01/03/2022 |
| All discovery requests **and depositions** served and non-expert depositions completed | 05/03/2022 | | |
| All motions under MRCP 56 | 06/02/2022 | 07/04/2022 | |
| Final pre-trial conference held and/or firm trial date set | | | 10/31/2022 |
| Case shall be resolved and judgment shall issue by | | | 07/07/2023 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 07/07/2021 | ASSISTANT CLERK Margaret M Buckley | PHONE (617)788-8110 |
|---|---|---|

Date/Time Printed: 07-07-2021 13:56:32                                                                                          SCV026\ 08/2018

**COMMONWEALTH OF MASSACHUSETTS**

SUFFOLK, SS:
SUPERIOR COURT
DEPARTMENT OF THE TRIAL COURT
CIVIL ACTION NO. 2184CV01533

SIMONE GREGG,                        )
Plaintiff,                           )
                                     )           E-FILED 8/11/2021
                                     )
v.                                   )               RB
                                     )
                                     )
NORTHEASTERN UNIVERSITY,             )
PAUL ZERNICKE, MARYELLEN SHEA,       )
DIANA FITZGERALD, ALEXIS HARDING     )
and BRIGID MOLLOY,                   )
Defendants                           )
                                     )

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

        Pursuant to Massachusetts Rule of Civil Procedure 4(c), the Plaintiff, Simone Gregg, respectfully moves that Robert Messina be specially appointed for the purpose of serving process and other papers in the above-captioned case.

        Helen G. Litsas, Esq. certifies that to the best of her knowledge and belief the person appointed process server is experienced in the service of process, is 18 years of age or over, and is not a party to this action.

                                SIMONE GREGG,
                                By her attorney,

                                /s/ *Helen G. Litsas*

                                _____

                                Helen G. Litsas, Esquire
                                BBO #644848
                                22 Mill Street, Suite 408
                                Arlington, MA 02476
                                Tel. No.: 781-646-1518

CF000992