UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SIMONE GREGG,                             )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )        CIVIL ACTION NO. 21-11495-JGD
                                          )
NORTHEASTERN UNIVERSITY, PAUL ZERNICKE,   )
and MARYELLEN SHEA,                       )
                                          )
                 Defendants.              )
_____)

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

August 1, 2024

DEIN, U.S.M.J.

## I. <u>INTRODUCTION</u>

Following her resignation from Northeastern University ("Northeastern" or "the University") in August of 2019, Plaintiff Simone Gregg ("Gregg") brought suit against Northeastern; her direct supervisor Paul Zernicke ("Zernicke"); Northeastern Leave Management Specialist Maryellen Shea ("Shea") (collectively, the "Defendants"); and others,[1] alleging, *inter alia*, interference with her rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2614 *et seq.* ("FMLA"). Specifically, Gregg's Complaint (("Compl.") Docket No. 1-1)

---

[1] Gregg had also brought suit against HR Business Partner Alexis Harding and two members of Northeastern's Office of University Equity and Compliance, Diana Fitzgerald and Brigid Hart-Molloy. On April 20, 2022, this court allowed the motions to dismiss filed by these three defendants, dismissing them from the case. (<u>See</u> Docket Nos. 49, 50). Only the claims against Northeastern, Zernicke, and Shea remain.

includes the following four counts: "Violation of Family Medical Leave Act - 29 U.S.C. § 2614(a) and 29 U.S.C. § 2615(a)(1)" (Count One); "Violation of Family Medical Leave Act - 29 U.S.C. § 2615(a)(2)" (Count Two); "Intentional Interference with Contractual/Advantageous Relations" (Count Three); and "Intentional Infliction of Emotional Distress" (Count Four).  (See Compl. ¶¶ 167-182).

The three remaining Defendants have moved for summary judgment, and the matter is before the court on the "Defendant Maryellen Shea's Motion for Summary Judgment" (Docket No. 100) and "Defendants Northeastern University and Paul Zernicke's Motion for Summary Judgment" (Docket No. 102).  After careful consideration of the parties' written submissions and their oral arguments, and for all the reasons detailed below, the Defendants' Motions for Summary Judgment are ALLOWED.  The material facts are not in dispute and Gregg has failed to state any claims as a matter of law.

## II. STATEMENT OF FACTS

Except where noted, the following facts are undisputed.[2]

---

[2] The facts described herein are derived from the following materials: the (1) "Consolidated Statement of Undisputed Facts and Responses for Maryellen Shea's Motion for Summary Judgment" ("CSSOF ¶ __") (Docket No. 126); the (2) "Consolidated Statement of Facts and Responses in Support of Northeastern University and Paul Zernicke's Motion for Summary Judgment" ("CSNOF ¶ __") (Docket No. 128); the (3) "Declaration of Paul Zernicke" ("Zernicke Decl.") (Docket No. 106); the (4) "Declaration of Maryellen Shea" ("Shea Decl.") (Docket No. 107) and the exhibits attached thereto ("Shea Decl., Ex. __"); the (5) "Declaration of Christina Duszlak in Support of Defendants' Motions for Summary Judgment" ("Duszlak Decl. 1") (Docket No. 108) and select exhibits (see Docket Nos. 109, 110, 111) referenced therein ("Duszlak Decl. 1, Ex. __"); the (6) "Declaration of Helen G. Litsas in Support of Plaintiff's Opposition" to Northeastern and Zernicke's Motion for Summary Judgment ("Litsas Decl. 1") (Docket No. 122) and select exhibits attached thereto ("Litsas Decl. 1, Ex. __"); the (7) "Declaration of Helen G. Litsas in Support of Plaintiff's Opposition to Defendant Maryellen Shea's Motion for Summary Judgment ("Litsas Decl. 2") (Docket No. 124) and an exhibit attached thereto ("Litsas Decl. 2, Ex. A"); and the (8) "Supplemental Declaration of Christina Duszlak in Support of Defendants' Motions for Summary

### Gregg Joins Northeastern as a Development Associate

On November 27, 2017, Northeastern hired Simone Gregg as a Development Associate within its Office of University Advancement.[3]  (CSNOF ¶ 5; CSSOF ¶ 10).  In this role, she managed calendars and databases, booked travel arrangements, covered the office's front reception desk, and conducted other administrative tasks.  (CSNOF ¶ 7).  Gregg reported directly to Zernicke, who was Northeastern's Associate Vice-President of Development and the individual responsible for overseeing and coordinating fundraising operations across the University.  (Id. ¶ 8; CSSOF ¶ 11; Zernicke Decl. ¶ 2).

### Gregg Begins to Request (and Receive) Medical Leave

During her time at Northeastern, Gregg requested both long-term and intermittent leave under the FMLA to help manage a chronic medical condition.  Gregg made these requests to Shea, the Senior Leave Management Specialist responsible for administering leaves of absence taken by Northeastern employees,[4] including those leaves taken under the FMLA.  (CSSOF ¶¶ 1, 3; CSNOF ¶ 2; Shea Decl. ¶ 2).  In connection with her role, Shea had received training on the FMLA and routinely consulted related regulations and Department of Labor ("DOL") guidelines.  (CSSOF ¶¶ 4-5; CSNOF ¶ 3).  The University itself maintained a leave policy for its employees which described an employee's eligibility for leave, including leave taken

---

Judgment" ("Duszlak Decl. 2") (Docket No. 129) and select exhibits attached thereto ("Duszlak Decl. 2, Ex. __").

[3] Gregg had worked as a temporary employee at the University for the month prior.  (CSNOF ¶ 6).

[4] Shea worked in Northeastern's Absence Management Department, formerly referred to as the "Benefits Department," a component of the University's Human Resources ("HR") Department.  (CSSOF ¶ 2; Shea Decl. ¶ 2).  In this role, Shea played no part "in managing [Gregg], overseeing her work or otherwise evaluating her performance."  (Shea Decl. ¶¶ 5-10).

under the FMLA,[5] and their attendant rights under the law.  (CSNOF ¶ 1; CSSOF ¶ 6-7; see Duszlak Decl. 1, Exs. 3-4).[6]  In addition, Northeastern also issued a policy with respect to anti-retaliation, on which all employees received mandatory annual training (CSNOF ¶ 4; see Litsas Decl. 1, Ex. C at 13), and a separate policy related to paid time off ("PTO"), including paid sick time, vacation time, personal time, and other forms of paid time off.  (CSSOF ¶ 8; see Duszlak Decl. 1, Ex. 5).  Shea referred to both the leave and PTO policies as part of her work in the Absence Management Department.  (CSSOF ¶ 9).

Gregg first discussed a potential medical leave with Shea in May of 2018 when the pair met and Gregg disclosed her medical condition.  (Id. ¶¶ 13-14).  A few months later, in August of 2018, Gregg requested and was approved by Shea for a medical leave of absence.  (Id. ¶ 17; CSNOF ¶ 12).  Gregg had originally asked to use FMLA to cover the leave but because, by that time, she had worked at the University for less than one year, Shea explained to her that she was ineligible for FMLA leave.  (CSSOF ¶¶ 15-16).  Shea informed Gregg that she could still take a medical leave, however, and that she could use her sick time towards her absences.  (See Duszlak Decl. 1, Ex. 1 at 12).  Gregg proceeded to take a medical leave of absence in August of 2018 and later returned to work on September 4, 2018.  (See Litsas Decl. 1, Ex. A at 14).

On January 23, 2019, by which time she had worked at Northeastern for more than one

---

[5] Consistent with the terms of this policy—and the statute itself—only those employees "who ha[d] been employed for a minimum of twelve months and worked a minimum of 1,250 hours in the last twelve months" were eligible for FMLA leave.  (Duszlak Decl. 1, Ex. 3 at 5, Ex. 4 at 4); see 29 U.S.C. § 2611(2)(A)(i), "Eligible Employee" ("The term 'eligible employee' means an employee who has been employed – for at least 12 months by the employer with respect to whom leave is requested[.]").

[6] Citations to page numbers of the parties' exhibits will be to the court's CM/ECF numbering system located at the top right of the exhibit.

year, Gregg met with Shea to discuss the process related to applying for FMLA leave.  (CSSOF ¶ 18; CSNOF ¶ 27).  During their meeting, Shea provided Gregg with a copy of Northeastern's FMLA Leave Application (the "Application"), a copy of the DOL's standard FMLA Notice of Eligibility and Rights & Responsibilities, and a copy of the DOL's standard Certification of Health Care Provider ("CHCP") form.  (CSSOF ¶ 19-20; CSNOF ¶ 28; Shea Decl. ¶¶ 12-13 & Exs. A, B). Gregg submitted both the CHCP form and the Application on February 12, 2019.  (CSSOF ¶ 21). Gregg's original Application had been missing Zernicke's signature, but after Shea assured her that her manager would not be exposed to her medical information, Gregg resubmitted the Application on February 14, 2019 with Zernicke's signature.[7]  (Id. ¶¶ 22-24).

Since Gregg's job responsibilities included covering the front reception desk and making arrangements for other employees, Zernicke indicated that it was important that he know when Gregg would be away from her desk.  Reading the record in the light most favorable to Gregg, it appears that this led to conflicts between Zernicke and Gregg, who found Zernicke's requirements that she account for her time to be overly intrusive.

On February 18, 2019, Gregg emailed Shea that she was experiencing conflicts with Zernicke, "in relation to needed appointments" and asked "for the approval decision to be sped up[,]" explaining that she believed an approved FMLA leave "would help to resolve some of this."  (Duszlak Decl. 1, Ex. 10 at 4).  The following day, on February 19, 2019, Shea approved Gregg for intermittent FMLA leave.  (CSSOF ¶ 25).  This approval covered "5 episodes per month with the duration of 1-2 days per episode and up to seven hours per day."  (Id.).  An

---

[7] Zernicke maintains that he did not have access to any of the FMLA forms Gregg submitted "from her doctor" and was otherwise "unaware of their contents."  (Zernicke Decl. ¶ 3).

"episode" covered "a situation when an employee could not come to work because of their condition." (Id.; see Duszlak Decl. 1, Ex. 13 at 2). With this approval, Gregg was instructed to inform Shea and her manager, Zernicke, "whenever she used intermittent leave, either the day of the absence or within two business days after the absence." (Shea Decl. ¶ 15; see CSSOF ¶ 26). While Gregg was expected to notify both Shea and Zernicke of her use of the benefit, only Shea was responsible for approving it. (Shea Decl. ¶ 15; CSSOF ¶ 27).

Gregg Continues to Revise the Scope of Her FMLA Leave Approval<br>and Seeks Shea's Assistance in Understanding How Her Leave is Managed

Following this initial approval, Gregg indicated that she intended to speak with her doctor about making changes to her FMLA leave approval to cover certain medical appointments. (CSSOF ¶ 32). In response, Shea provided her with a revised FMLA approval letter on February 22, 2019 that added additional time off for medical appointments. (Id. ¶ 35; Duszlak Decl. 1, Ex. 14 at 2-3). Three days later, on February 25, 2019, Gregg informed Shea that she intended to again revise her intermittent leave and indicated that she would be submitting another CHCP form. (CSSOF ¶ 36). Upon learning of this request, Shea's assistant asked Shea privately why Gregg continued to revise her leave, to which Shea responded she is: "Driving me crazy." (Id. ¶ 37; Duszlak Decl. 1, Ex. 16 at 2). As she began to use the benefit, Gregg would at times become confused with respect to how her intermittent leave was approved, tracked, and processed, the nature and extent of the benefits available to her under the FMLA, and how her use of FMLA leave interacted with the existing vacation, sick, and personal time balances that were also available to her. (CSSOF ¶¶ 30-31, 39-47, 50, 53). In these instances, Gregg sought help from Shea. (See Id.). Despite her ongoing confusion, Gregg acknowledges that it was not unreasonable for Northeastern to expect her to use her own PTO

[6]

balances in accordance with its policies.  (Id. ¶ 42).

Nevertheless, on April 1, 2019, Gregg submitted two CHCP forms from two separate health care providers.  (Id. ¶ 51).  While one CHCP form indicated that Gregg required time off for "four episodes per month for flare-ups[,]" the other reported her needing time off for "at least 5-7 episodes per month in addition to five flare-ups per month."  (Id. ¶ 52).  Shea found the two forms confusing, as she "could not determine how many absences Ms. Gregg's doctors were authorizing per month."  (Shea Decl. ¶ 17).  On April 10, 2019, Shea and her assistant met with Gregg to discuss her submissions.  (CSSOF ¶ 56).  During their meeting, Shea informed Gregg that it was typical for only one physician to fill out a CHCP form and act "as the gatekeeper" in the event an employee had multiple providers.  (Id. ¶ 57; Duszlak Decl. 1, Ex. 23).  In light of this fact, and after receiving confirmation internally, Shea asked Gregg to submit "a single CHCP form from one provider" so a provider "could explain to [her] the total amount of leave [Gregg] needed each month."  (CSSOF ¶ 56; Shea Decl. ¶ 18; see also Duszlak Decl. 1, Ex. 22).  In response, Gregg asked Shea not to process the new CHCP forms and that she would follow up with her providers.  (CSSOF ¶¶ 58-59; Shea Decl. ¶ 19).

On May 28, 2019, Gregg submitted an updated CHCP form from a single provider. (CSSOF ¶ 61; Shea Decl. ¶ 20).  Because this new form indicated that Gregg required leave for medical appointments "but did not specify the frequency and duration" of those anticipated appointments, Shea, citing FMLA regulations, explained to Gregg how the form was incomplete and requested that she submit a revised CHCP within seven days.  (Shea Decl. ¶ 21; CSSOF ¶¶ 61-62).  When Gregg resubmitted the CHCP form on May 31, 2019, it appeared to Shea as if the handwriting on the form "was in two different ink colors" and that "some information had been

deleted." (Shea Decl. ¶ 22; see CSSOF ¶ 63). Suspecting that it had been altered, Shea verified with Gregg's provider that the information on the CHCP form was completed or authorized by the provider. (CSSOF ¶ 65; Shea Decl. ¶ 22). This was Shea's "standard practice" in instances where she was "concerned about whether the information was from or authorized by an employee's health care provider," and she understood such practice to be "permitted by the FMLA." (Shea Decl. ¶ 22). While Gregg disputes Shea's characterization of the form, she nonetheless admits that "information may have been redacted concerning her new diagnoses that were not required to be included" (CSSOF ¶ 64), information she "no longer felt comfortable disclosing[.]" (Duszlak Decl. 1, Ex. 6 at 142-43). Nonetheless, upon the provider's confirmation, Shea issued a revised FMLA approval form to Gregg on June 7, 2019 based on the information provided in the CHCP form. (CSSOF ¶¶ 65-66; Shea Decl. ¶ 22; see Duszlak Decl. 1, Ex. 26).

With the exception of the initial August 2018 leave for which she was ineligible, Gregg does not dispute that Shea approved—and, in turn, that she received—each of her requests to use FMLA leave. (CSSOF ¶¶ 28-29; CSNOF ¶¶ 44-45). However, on May 13, 2019 Shea learned that Gregg raised a complaint against her with Northeastern's Office for University Equity and Compliance ("OUEC"). (CSSOF ¶ 60; see Duszlak Decl. 1, Ex. 1 at 49-51).[8]

---

[8] According to Gregg, she felt "bull[ied] [by Shea] during in-person meetings" and claims that Shea would "speak to [her] in a demeaning manner during telephone communications." (CSSOF ¶¶ 96-97). Gregg had initiated complaints against Zernicke, Shea, and other members of HR with the OUEC (id. ¶ 60; CSNOF ¶ 72), but when she elected to pursue a formal investigation and resolution process, she named only Zernicke as a respondent. (Duszlak Decl. 1, Ex. 17 at 22-23; see note 15).

<u>Gregg and Zernicke Clash Over Her Job Performance, Attendance, and Dependability</u>

In the midst of her communications with Shea, Gregg experienced ongoing tension with Zernicke.  According to Gregg, after she first voluntarily disclosed her medical condition to him in April of 2018 and discussed her "plan to use FMLA intermittent leave[,]" Zernicke "began to blame her for his mistakes[,] . . . micromanage her[,]" and "cause her to have uncomfortable interactions."  (CSNOF ¶¶ 10-11, 14; <u>see</u> Litsas Decl. 1, Ex. A at 14-15).  While Gregg admits that Zernicke both encouraged her to contact HR in order to understand the benefits available to her and allowed her to take time off to attend her medical appointments, she nonetheless claims that he engaged in conduct aimed at "deter[ing] her from attending these appointments" (CSNOF ¶ 16), asked her "uncomfortable and demeaning questions regarding [her] diagnosis[,]" and wanted to know "the specifics surrounding" her symptoms.[9]  (Litsas Decl. 1, Ex. A at 15, 18-19).  A review of the factual record, however, fails to support Gregg's assertions.

Despite being ineligible for the benefit during the majority of the following instances, Gregg suggests that certain actions Zernicke took and requests he made of her were in retaliation to her "exercising her rights under FMLA[.]"  (CSNOF ¶ 23).  As she describes, these included Zernicke:

- requiring that Gregg apply for a scholarship in order to attend a particular conference (<u>id.</u> ¶¶ 19-20);

- denying Gregg's request to attend a presentation on Northeastern's endowment

---

[9] Gregg claims that, on one unspecified occasion, Zernicke informed her that he could call and speak to her doctor to make sure that she was not abusing her FMLA.  (<u>See</u> Duszlak Decl. 1, Ex. 6 at 128).  Gregg also claims that Zernicke once told her that "at least [he] could walk."  (<u>See</u> <u>id.</u> at 165-66).

scheduled for 10 a.m., "during her normal work hours" (id. ¶ 25);[10]

- seeing that Gregg received a lower salary increase than what she thought she deserved because of her use of FMLA leave (Litsas Decl. 1, Ex. A at 44-45, 47-48; CSNOF ¶ 105);[11]

- "limit[ing] [Gregg's] attendance at events that were during her person[al] time or lunch hour" (CSNOF ¶ 23); as well as

- requiring that Gregg first submit any requests to attend "conferences and events that occur during office hours and/or require budgetary support" (Duszlak Decl. 1, Ex. 40 at 3) "in writing so that he could assess whether the conference [was] job-related and its benefits." (CSNOF ¶ 22).[12]

Although she viewed these requests as retaliatory, Gregg acknowledges that Zernicke "emphasiz[ed] that he wanted [her] to find learning opportunities in the building" and to attend events and trainings relevant to her own work responsibilities. (Litsas Decl. 1, Ex. A at 55). Gregg, in response, indicated that "she 'completely agree[d]' that these opportunities should be relevant to her job." (CSNOF ¶ 23; Duszlak Decl. 1, Ex. 40 at 2) (alteration in original). Gregg further acknowledges that Zernicke suggested and approved her attendance at particular trainings he viewed as related to her role, and that he approved her for two raises during 2018. (CSNOF ¶ 21; see Duszlak Decl. 1, Ex. 6 at 104-05, Ex. 42, Ex. 44 at 2). Gregg, however, disagreed with Zernicke over "what was relevant to her role" and over what she viewed as the "limitations" he set "as to her professional development[] opportunities[.]" (CSNOF ¶ 26).

---

[10] When, in an email, Gregg asked whether it would be a good idea for her to attend the fundraising presentation, Zernicke responded: "I was just informed that it is oriented to frontline fundraisers, and that is the expected attendee group. I will/can pass along anything that is immediately and directly relevant to your role." (Duszlak Decl. 1, Ex. 41 at 2). Gregg replied: "Sounds good, Paul!" (Id.).

[11] Specifically, Gregg testified that a subsequent merit raise "[p]aid far less in comparison to the first merit raise" she received. (Litsa Decl. Ex. A at 47).

[12] Gregg explains that, "as far as [she was] aware" (see Duszlak Decl. 1, Ex. 6 at 57), she was "the only one of her coworkers who had these restrictions." (CSNOF ¶ 22).

Gregg also claims that while Zernicke had initially given her "freedom, independence and autonomy in the workplace[,]" he began to "question[] her whereabouts and demand[] access to her [Outlook] calendar" following "her exercise of her rights under [the] FMLA and her medical appointments."  (CSNOF ¶¶ 31-32, 125; see also ¶ 131).  On one particular occasion, on February 15, 2019—before Gregg had been approved for FMLA leave—Zernicke emailed her to ask her whereabouts after he noticed that her Outlook calendar "was just marked busy."[13]  (Id. ¶ 31; see Duszlak Decl. 1, Ex. 45 at 3-5).  According to Zernicke, this was not the first time he was unsure of where Gregg was during the workday and others within the department had made similar comments to him.  (CSNOF ¶ 31).  Gregg claims that at those times she was away from her desk, Zernicke would "ask[] loudly" where she was, and that this behavior was "rather embarrassing" and "seemed unnecessary[.]"  (Litsas Decl. 1, Ex. A at 49-50).  For her part, Gregg does acknowledge that Zernicke was "not always in [his] office during the workday" and that, as a result, he relied on her to tell him where she planned to be during those periods when she was not going to be at her desk.  (CSNOF ¶¶ 29-30).

At some point, Zernicke requested that Gregg allow him access to her work calendar.  (Id. ¶ 32).  Zernicke explains that he made this request so that he knew where Gregg was during

---

[13] Gregg claims that, in this particular email chain, Zernicke "sought to critique her medical needs and denigrated [her] FMLA requests in derogatory fashion as 'special needs.'"  (CSNOF ¶ 32).  The email Gregg cites as "derogatory" in fact reads, in relevant part:

"Again, moving forward as we said we would do last week–during business hours please make clear appointments in the office (where and with whom) and "approved comp time" for personal/medical appointments.  As I said, I am trying to balance your special needs with the needs of the office–including having administrative assistance available during regular business hours.  FMLA will certainly make this process smoother as well."

(Duszlak Decl. 1, Ex. 45 at 2).

work hours, but Gregg disputes his motivations for doing so.  (Id.).  In any event, Gregg objected

to Zernicke's request and perceived it as his "effort to obtain workplace surveillance."  (Id. ¶¶

32-33).  In an email sent on February 19, 2019, shortly after his request, Zernicke clarified that

"as [her] supervisor, [he] need[ed] a more clear idea of [Gregg's] schedule/whereabouts during

business hours."  (Id. ¶ 34).  Some weeks later, on April 24, 2019, Gregg, citing a flexible work

arrangement she had created earlier with Zernicke's approval, asked to leave early because she

had worked through her lunch hour.  (Id. ¶ 70).  Zernicke viewed Gregg's request as an attempt

"to take advantage of the arrangement" and suggested "if she were sick, she should use sick

time."  (Id. ¶ 71).  Gregg, while acknowledging that her use of flexible time as an

accommodation differed from her use of FMLA time for absences, nevertheless claims that

Zernicke "did not limit his view that [she] was taking advantage of a flexible accommodation

but rather . . . viewed [her request] within the context of his belief that [she] was abusing FMLA

time."[14]  (Id.; see Duszlak Decl. 1, Ex. 6 at 85).  At some point after their exchange, Gregg filed a

race, gender and disability complaint with Northeastern's Office for University Equity and

Compliance ("OUEC").[15]  (Id. ¶ 72).

_____

[14] According to Gregg, when she discussed the possibility of a flexible work arrangement and schedule
with Zernicke, Zernicke asked Gregg how she got "so many appointments" and whether her condition
would "eventually stop."  (CSNOF ¶¶ 35-37, 137; Duszlak Decl. 1, Ex. 6 at 38).  Zernicke explains,
however, that his questions "were in the context of developing a flexible work arrangement" unrelated
to the use of FMLA, and that he "agreed that Gregg could adjust her work hours by coming in early and
leaving early depending on her fatigue."  (CSNOF ¶ 37).

[15] As part of her complaint with OUEC, Gregg alleged that Zernicke had, among other things, engaged in
discrimination by accusing her of abusing her FMLA leave, discussing her leave during her performance
evaluation, and by retaliating against her by providing a negative reference with respect to her
application to the HR Coordinator position.  (See Duszlak Decl. 1, Ex. 52 at 2; CSNOF ¶ 80).  According to
Gregg, "HR, as well as [Zernicke], were collaborating basically accusing [her] of FMLA abuse."  (Duszlak
Decl. 1, Ex. 6 at 127; see CSSOF ¶ 89).  While Gregg initially agreed to and participated in an informal
process with an assigned OUEC investigator, she later decided to initiate a formal complaint and

On more than one occasion, Zernicke sought guidance from Alexis Harding ("Harding"), an HR Business Partner, on how to manage and address Gregg's job performance while recognizing her need for leave.[16]  (CSNOF ¶ 62; see Litsas Decl. 1, Ex. C at 2-4; Duszlak Decl. 1, Ex. 2 at 14-15).  As Zernicke describes, determining Gregg's whereabouts and "whether or not she was interruptible" became a "recurring source of frustration" for him as her manager. (Duszlak Decl. 1, Ex. 8 at 13-14).  Nevertheless, Harding advised Zernicke "to manage Gregg's performance and address performance concerns, but to keep FMLA considerations separate from his assessment."  (CSNOF ¶ 63; see also Duszlak Decl. 1, Ex. 2 at 11).

Gregg's annual performance evaluation, which Zernicke prepared after seeking guidance from HR and which he provided to Gregg in March of 2019, praised Gregg's performance in some areas but expressed concern in others.[17]  (CSNOF ¶¶ 57, 60-61, 64; see Duszlak Decl. 1, Ex. 50 at 2-10).  After Gregg complained to HR about her evaluation—which she characterizes

---

requested a new investigator upon her belief that the first investigator had sided with Zernicke on a particular issue relevant to her complaint.  (CSNOF ¶¶ 73-79).  On August 7, 2019, the OUEC notified Gregg that they had "found insufficient evidence to support a violation" and would thus "consider[] [the] matter closed effective immediately."  (Duszlak Decl. 1, Ex. 53 at 4).  Gregg responded: "I had a feeling this would be the result.  Fortunately, I've taken other measures."  (Id. at 2).  Gregg claims that OUEC's findings and the result of its investigation "were the result of bias against her."  (CSNOF ¶ 83).

[16] Harding testified that, in these instances, Zernicke sought guidance on how to appropriately manage Gregg's whereabouts and his need for her presence at the front reception desk of the office while still being sensitive to her needs.  (Litsas Decl. 1, Ex. C at 2-3; Duszlak Decl. 1, Ex. 2 at 17-18).  In response, Harding indicates that she suggested that Zernicke ask Gregg "from a scheduling perspective . . . to disclose where she was in those blocks of time because her goal -- her job was to cover the front desk and to be present at the front desk."  (Litsas Decl. 1, Ex. C at 3; see Duszlak Decl. 1, Ex. 2 at 7-8, 15-16).

[17] In particular, the evaluation marked Gregg as partially meeting expectations in three out of six areas and as needing improvement with respect to three categories related to her "skills and competencies." (Duszlak Decl. 1, Ex. 50 at 3-6).  Gregg's "Overall Performance Rating" indicated that she only partially met expectations.  (Id. at 7).  Notably, in no section did the evaluation reference Gregg's FMLA requests or her use of the benefit.  (See generally id.).

as "unfair[,]" retaliatory, "infused with subjective criticism[,]" and as having "minimized" her own accomplishments—Gregg was encouraged to write a response to it.  (CSNOF ¶¶ 65-66; <u>see</u> Litsas Decl. 1, Ex. A at 48-49).  Gregg and Zernicke later met to discuss Gregg's response.  During the meeting, Zernicke shared that he did not agree with her perspective on the evaluation, to which Gregg later responded, "that we can agree to disagree."  (CSNOF ¶ 67; <u>see</u> Litsas Decl. 1, Ex. A at 57).

Ultimately, while Gregg explains that Zernicke seemingly "did not always approve of her FMLA use[,]" she admits that there was never an appointment that he told her she could not go to, and she does not claim that he ever caused Shea to not approve her FMLA requests. (CSNOF ¶ 43; <u>see</u> CSSOF ¶ 27, Duszlak Decl. 1, Ex. 6 at 46-47).  Similarly, Gregg does not dispute that Shea approved—and, in turn, that she received—each of her requests to use FMLA leave for which she was eligible.  (CSNOF ¶¶ 44-45; CSSOF ¶¶ 28-29; <u>see</u> Shea Decl. ¶ 16; Duszlak Decl. 1, Ex. 6 at 46-47).

<u>Gregg Applies for the Position of HR Coordinator, an Internal Posting Within Northeastern</u>

On May 20, 2019, Gregg applied for an HR Coordinator position within Northeastern's Office of the Chancellor, a role which required HR-related experience.  (CSNOF ¶ 88).  The hiring manager, Stacey Pierce ("Pierce"), reviewed Gregg's application for the position but noted that it lacked the requisite HR experience.  (<u>Id.</u> ¶ 89).  Despite this, Pierce scheduled Gregg for "a courtesy phone screen" interview, which was her practice for internal candidates.  (Litsas Decl. 1, Ex. D at 2; <u>see</u> CSNOF ¶ 90).  Gregg advanced to the next round of interviewing, where Pierce had narrowed her search to two final candidates: Gregg, and an external candidate who held a similar human resources role at a different college.  (CSNOF ¶¶ 91-93).

As part of this process, Pierce requested references from both candidates.  (Id. ¶ 94).

Pierce requested to speak with Zernicke, whom Gregg had not initially included as a reference,

and Gregg informed him accordingly.  (Id. ¶¶ 95-96).  Zernicke told Gregg that "he would be

honest" in his reference,[18] to which Gregg responded that it would be "illegal" for him to give

her "a bad reference."  (Id. ¶ 97; see Litsas Decl. 1, Ex. A at 5-6).  After this exchange, Gregg

decided that she did not want Zernicke to serve as a reference.  (CSNOF ¶¶ 97, 156).  Zernicke

himself decided to refer Pierce to Harding to serve as Gregg's reference rather than, as he

claims, "risk giving an honest reference and having Gregg label it as retaliatory[.]"  (Id. ¶ 98).  In

the end, Pierce did not receive a reference from Zernicke or speak with him about Gregg's job

performance, and she did not contact Harding before extending an offer to the external

candidate, reasoning that "she had the required experience[,]" while Gregg did not.  (CSNOF ¶¶

99, 153; see Litsas Decl. 1, Ex. B at 2; Duszlak Decl. 1, Ex. 55 at 17, 20-21).

According to Gregg, however, the interview process was "subjective" and Pierce failed

to account for Gregg's own "HR experience organizing interviews and extending interviews for

employee candidates[,]" among other things.  (CSNOF ¶¶ 99, 152).  Gregg claims that Zernicke's

actions were retaliatory, and, as she explains:

> [o]nly after Zernicke failed to provide her with a favorable reference, interfered
> with [the] hiring process and indicated his desire to provide a bad reference for
> her to the hiring manager for the HR Coordinator position, was that job
> opportunity lost.

---

[18] In particular, and according to Zernicke, he informed Gregg that any reference would be "mixed" and
include "many positive features" but also "acknowledge the bumps in the road, as well."  (Duszlak Decl.
1, Ex. 8 at 27-28).  From these remarks, Gregg concluded that any reference Zernicke did provide would
likely be negative.  (See Litsas Decl. 1, Ex. A at 6).

(CSSOF ¶ 81; see Litsas Decl. 1, Ex. A at 67).

<u>Gregg Resigns from Northeastern After Accepting a New Role with a Different Employer</u>

It is undisputed that, at the start of each fiscal year, July 1, Northeastern encourages its managers to discuss employee goals for the new year.  (CSNOF ¶ 106).  After Gregg returned from vacation in July of 2019, she and Zernicke met.  (Id. ¶ 107).  The Defendants explain that the purpose of this meeting was "to discuss goals for the new year[,]" while Gregg claims that Zernicke arranged the meeting in order "to impose changes to the terms and conditions of her employment in response to her complaints to the OUEC and HR about his conduct and in response to her use of FMLA intermittent leave."  (Id.).

On July 22, 2019, Zernicke sent a follow up email to Gregg with the subject line, "Expectations" which set out various expectations for her job performance.  (Duszlak Decl. 1, Ex. 58 at 3-5).  It read:

Simone,

The talents you offer to Advancement are appreciated -- as I have acknowledged to you in-person (e.g. April 8 where I thanked you again for your copious notes of the March 20 DOD meeting) and periodic emails (e.g. June 11 for Concur Report reminder).  However, I am also mindful of performance related issues since your March 15, 2019 evaluation, and the need for consistently reliable, highly professional and active administrative support.  Thus, I am writing to reiterate my expectations for this new fiscal year, and to inform you of measures intended to ensure the flow, and consistent quality of your work.  More specifically, my expectations are that during your "working hours" you will:

1.)  As previously discussed, please clarify entries in your NU Outlook calendar so I may have a better sense of your availability and NU meetings during work hours. With the exception of non-confidential NU work-related meetings/commitments, I neither seek nor expect the details (who, why, etc.).

Entries should read one of the following:
a)  "Meeting with NAME and LOCATION" (for all work meetings with internal colleagues during office hours both on campus and off campus).
b)  "Lunch"

[16]

c)  "Confidential" – Not to exceed three appointments per month; The date and duration of "internal confidential" meetings on your calendar should be verifiable when they take place during compensated time. *HR has agreed to serve this function.*

d)  "Medical—FMLA"

e)  "Non-FMLA Medical" – This will require requested/approved time off.

f)  "Vacation" – This will require advance requested/approved time off.

g)  "Personal Time" – This will require advance requested/approved time off.

2.)  At all times and in all university communications, including email, maintain a respectful and professional demeanor.  I expect that you will be respectful in our conversations as well, that includes refraining from making dismissive declarations such as "We need to agree to disagree" (your words in reaction when I met with you on June 11 to admonish and address constructively a series of passive-aggressive emails from you to HR).

3.)  Listen intently.  Your disregard of constructive criticism is detrimental to your growth and your ability to be successful in this role.  There have been several instances of this including the June 11 conversation.

4.)  Be detail orientated and accurate in your work (e.g. as I pointed out on April 22 when the contact name and number was wrong in the April 19 briefing for my Philadelphia trip).

5.)  Demonstrate efficiency, prioritization, and proactivity in your work.  You will recall that at our April 22 meeting I encouraged you to take initiative, rather than just respond to my requests (giving the example that you could update the directory of my reports since there have been numerous changes—I have yet to see that happen).

6.)  Carry out work on assigned projects with both efficiency and effectiveness. Effective July 29, each Monday, please submit in writing a list of projects you are working on (and deadlines when relevant), and at the close of business each Friday send me via email a written update on projects.  Consistent with this, I will be giving you work with associated deadlines as well.  With the new fiscal year ratcheting up, a new campaign in the works, and my own professional responsibilities likely expanding, this customary approach to tracking work in progress is of increasing importance.

Let us monitor your progress together.  Let me know if you have questions about this, and please re-institute our one on one meeting schedule effective week of July 29.  *I remain committed to your professional development.*

Thank you.  Best regards, Paul.

[17]

(Id. at 4-5).  Gregg took issue "with the entirety" of Zernicke's email.  (CSNOF ¶ 111).  According to her, the email was retaliatory, "infused with hostility[,]" "threatened her with termination or other disciplinary action[,]" and made her "feel like she was being treated like a child."  (Id. ¶¶ 168, 172; see Litsas Decl. 1, Ex. A at 56, 58-59).[19]  In response to Zernicke's communication, Gregg claims to have "suffered a panic attack and an increase in her chronic pain."[20]  (CSNOF ¶ 171).

On August 9, 2019, Gregg was offered a role at Cambrian Analytics.[21]  (See Duszlak Decl. 1, Ex. 30).  After she accepted the position, she resigned from Northeastern three days later, on August 12, 2019.  (CSSOF ¶¶ 78-79; CSNOF ¶¶ 112-13; see also Duszlak Decl. 1, Ex. 29 (letter of resignation)).  While Gregg admits that the role with Cambrian paid more than Northeastern and presented an opportunity for her to gain HR experience—a responsibility she wanted in her next role—she maintains that her preference would have been to remain at Northeastern and

---

[19] Gregg further claims that Zernicke placed her on a Performance Improvement Plan ("PIP") with his email, which functioned as a "disciplinary action" intended "to facilitate her termination."  (CSNOF ¶¶ 109-10).  Zernicke disputes that his email was a PIP, or that it was disciplinary, but that it merely laid out "what [he] expect[ed] moving forward from [Gregg]."  (Duszlak Decl. 2, Ex. 60 at 3; see CSNOF ¶ 169).

[20] Specifically, as Gregg explained at her deposition:

once I received this e-mail, I immediately got a panic attack. . . . When I was on that vacation, I noticed that my pain -- my chronic pain had gone away completely . . . even once I got home, I was still fine.  But as soon as I got that retaliatory e-mail, when I had the panic attack is when my chronic pain started to appear again.

(Litsas Decl. 1, Ex. A at 66-67).

[21] Gregg was terminated by Cambrian Analytics just three months later.  (CSSOF ¶ 82; CSNOF ¶ 116).  On October 30, 2019, Gregg filed a charge of discrimination against Cambrian with the Massachusetts Commission Against Discrimination and at some point thereafter entered into a settlement agreement with the company.  (CSSOF ¶¶ 83-84; CSNOF ¶¶ 117-18; see Duszlak Decl. 1, Ex. 31).

receive the HR Coordinator position she had originally applied to, but was "constructively discharged[,]" "forced to leave her employment[,]" and left with no choice but to apply elsewhere "because of how Zernicke, Shea and others treated her in retaliation for using her FMLA intermittent leave and for exercising her FMLA rights."[22]  (CSSOF ¶¶ 80-81, 87; CSNOF ¶¶ 114, 173; see Litsas Decl. 2, Ex. A at 4, 9; Duszlak Decl. 1, Ex. 6 at 3).  On July 7, 2021, this suit followed.[23]

Additional factual details relevant to this court's analysis will be set forth below where appropriate.

### III. ANALYSIS

#### A.  Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the

---

[22] In particular, and according to Gregg, "the cumulative effect of the retaliation, interference and hostilities with respect to the exercise of her FMLA leave and rights increased the hostility in her work environment and increased the Plaintiff's anxiety and unhealthy activities, such as her increased cigarette smoking[,]" leaving her "with no choice but to leave her position[.]"  (CSSOF ¶ 87; see CSNOF ¶ 173).

[23] Gregg originally brought suit in Suffolk County Superior Court and it was later removed to this court by the Defendants on September 13, 2021.  (See Docket No. 1).

point in the favor of the non-moving party[.]'" Taite v. Bridgewater State Univ., Bd. of Trs., 999

F.3d 86, 93 (1st Cir. 2021) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).  "[A]

fact is 'material' if it 'has the potential of affecting the outcome of the case[.]'" Id. (quoting

Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)).

When a properly supported motion for summary judgment is presented, the non-

moving party can avoid summary judgment only by providing properly supported evidence of a

genuine dispute about material facts.  See Theriault v. Genesis HealthCare LLC, 890 F.3d 342,

348 (1st Cir. 2018).  Accordingly, "the nonmoving party must . . . 'set forth specific facts showing

that there is a genuine issue for trial[.]'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st

Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91

L. Ed. 2d 202 (1986)).  In evaluating a motion for summary judgment, the Court must review the

record "in a light most favorable to the non-moving party[.]" Lima v. City of E. Providence, 17

F.4th 202, 206 (1st Cir. 2021).  "[T]he Court need not consider 'conclusory allegations,

improbable inferences, [or] unsupported speculation.'" Id. (quoting Mulloy v. Acushnet Co.,

460 F.3d 141, 145 (1st Cir. 2006)) (alteration in original).  This is for good reason, as Rule 56

"mandates the entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Popular Auto, Inc. v. Reyes-Colon (In re Reyes-

Colon), 922 F.3d 13, 20 (1st Cir. 2019) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106

S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

Applying these principles to the instant case, the Defendants' motions for summary

judgment must be allowed.

[20]

### B.  The FMLA Claims: Counts One and Two

"The FMLA was enacted to help working women and men balance the competing demands of work and personal life."  Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)).  See also 29 U.S.C. § 2601(b)(1)-(2)).  "It includes two types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights."  Id. (additional quotations and citations omitted).  With respect to the former, eligible employees are, among other things, entitled "to up to twelve workweeks of unpaid leave, either continuous or intermittent, per year when the employee has 'a serious health condition that makes [her] unable to perform the functions of [her] position.'"  Surprise v. Innovation Grp., Inc. / First Notice Sys., Inc., 925 F. Supp. 2d 134, 145 (D. Mass. 2013) (quoting 29 U.S.C. § 2612(a)(1)(D)) (additional citations omitted).  With respect to the latter, an employer may not "'interfere with, restrain, or deny the exercise or the attempt to exercise any right' provided under the FMLA."  Darville v. Children's Hosp. Corp., Civil Action No. 11-10599-DJC, 2013 WL 4098756, at *3 (D. Mass. Aug. 14, 2013) (citing 29 U.S.C. § 2615(a)(1)).  Nor may an employer "discharge or in any manner discriminate against" an employee for asserting those rights.  Id. (citing 29 U.S.C. § 2615(a)(2)).  "[T]here is not always a 'clear demarcation'" between conduct alleged to be interference and conduct alleged to be retaliation, and here, Gregg asserts a claim under each theory.  Lopera v. Compass Grp. USA, Inc., 578 F. Supp. 3d 130, 135 (D. Mass. 2021) (quoting Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005)).

1.   <u>The FMLA's Two-Year Statute of Limitations Applies to Gregg's Claims</u>

Importantly, any claim asserting a violation of the FMLA must be brought no later than

two years "after the date of the last event constituting the alleged violation for which the action

is brought."  29 U.S.C. § 2617(c)(1).  Where the alleged violation was willful, however, the

statute of limitations window is extended from two years to three.  <u>See</u> 29 U.S.C. § 2617(c)(2).

In this way, 29 U.S.C. § 2617(c) provides "a two-year statute of limitations for FMLA violations

and a three-year statute of limitations for willful FMLA violations[.]"  <u>Cham v. Station Operators,</u>

<u>Inc.</u>, 685 F.3d 87, 98 n.7 (1st Cir. 2012).

Citing these provisions, the Defendants argue in their supporting memorandums that the

vast majority of Gregg's FMLA claims are precluded by the FMLA's two-year statute of

limitations and that any allegations against the Defendants predicated on events occurring

before July 7, 2019, two years prior to the date Gregg brought suit, "are time barred."[24]  (Docket

No. 101 at 9-10; Docket No. 103 at 10).  In both her Opposition to Northeastern and Zernicke's

Motion for Summary Judgment (Docket No. 117) and her Opposition to Shea's Motion (Docket

No. 121), Gregg claims that there "can be no question here that from the facts, a reasonable

juror could conclude that the Defendants willfully violated the statute" and therefore, the

FMLA's three-year—not two-year—statute of limitations applies.  (Docket No. 117 at 3-5; <u>see</u>

Docket No. 121 at 2-4).  This court disagrees.

An employer's conduct is willful when it "'either knew or showed reckless disregard for

the matter of whether its conduct was prohibited by the statute.'"  <u>Hillstrom v. Best W. TLC</u>

---

[24] <u>See</u> "Defendant Maryellen Shea's Memorandum of Law in Support of Her Motion for Summary
Judgment" (Docket No. 101) and "Memorandum of Law in Support of Defendants Northeastern
University and Paul Zernicke's Motion for Summary Judgment" (Docket No. 103).

Hotel, 354 F.3d 27, 33 (1st Cir. 2003) (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128,

133, 108 S. Ct. 1677, 1681, 100 L. Ed. 2d 115 (1988)).  To establish a willful violation, a plaintiff

must demonstrate that "'(1) the defendant employer had actual knowledge of, or showed

reckless disregard for, the requirements of the FMLA, and (2) intentionally disobeyed or ignored

the law.'"  Favreau v. Liberty Mut., Inc., 451 F. Supp. 3d 150, 160 (D. Mass. 2020) (quoting

Lukacinsky v. Panasonic Serv. Co., Civil Action No. 03-40141-FDS, 2004 WL 2915347, at *6 (D.

Mass. Nov. 29, 2004) (additional citations omitted).  "'The touchstone of a willful violation

appears to be evidence of discriminatory animus[,]'" which "can be demonstrated by evidence

of 'derogatory comments and overt hostility'" by an employer "towards the plaintiff's medical

condition and the need for medical leave."  Id. at 161 (quoting Lukacinsky, 2004 WL 2915347, at

*7-8).

Gregg claims that the Defendants' actions towards her "were infused with a

discriminatory animus with respect to her FMLA rights."  (Docket No. 117 at 5; Docket No. 121

at 4).  Specifically, she claims that Shea "repeatedly expressed hostility" and "reprimanded [her]

for her inquiries" with respect to managing and tracking FMLA leave, commented to a co-

worker "about how [Gregg] was driving her crazy[,]" and, together with Zernicke, "falsely

accused [her] of abusing her FMLA benefits."  (Docket No. 121 at 4-5).  Similarly, Gregg asserts

that Zernicke engaged in conduct to "deter her from attending her medical appointments[,]"

questioned "how she was able to get so many medical appointments, denigrated her

symptoms," and made derogatory comments.  (Docket No. 117 at 6).

In response, the Defendants dispute Gregg's characterization of these interactions in her

opposition as "an effort to distort both the record and the law."  (Docket No. 127 at 1).  As they

argue, the summary judgment record is devoid of conduct that would "rise to the level of willfulness." (Docket No. 101 at 10; Docket No. 103 at 11). See Darville, 2013 WL 4098756, at *5 (no evidence to raise genuine dispute that employer acted willfully with respect to alleged FMLA violations; plaintiff did not offer "more than [his] conclusory assertion as to why [defendant employer's] behavior would be willful"). This court agrees. It is undisputed that the Defendants were attentive and responsive to each and every one of Gregg's FMLA-related inquiries, conducted their own internal investigation into Gregg's numerous allegations and discovered no misconduct, and repeatedly consulted internal, regulatory, and DOL guidance in administering the benefit in an effort to hew to the statute's requirements.[25] Where, as here, the Defendants "'act[ed] reasonably in determining [their] legal obligation, [their] action[s] cannot be deemed willful[,]'"[26] and the facts simply cannot be read in a manner which would support a finding that they "intentionally disobeyed or ignored the law." Favreau, 451 F. Supp. 3d at 160 (citation omitted).

Without sufficient evidence for a factfinder to infer that the Defendants willfully violated the FMLA, Gregg cannot claim the benefit of the statute's three-year statute of limitations.[27] Gregg's FMLA claims will be addressed accordingly.

---

[25] As Gregg acknowledges in her Opposition, Shea, who was solely responsible for administering and approving Gregg's FMLA leave, "regularly consulted the FMLA regulations and Department of Labor ("DOL") guidelines." (Docket No. 117 at 5).

[26] See Hillstrom, 354 F.3d at 33 (quoting McLaughlin, 486 U.S. at 135 n.13, 108 S. Ct. at 1682 n.13 and explaining the reasoning behind adopting the FLSA standard for willfulness for FMLA claims).

[27] Even assuming she could, within this expanded window, Gregg would still be unable to identify an instance where she was denied an FMLA right to which she was entitled (interference) or point to a specific adverse action and construct the causal connection required for any prima facie case (retaliation).

2.  <u>Interference (Count One)</u>

In Count One of her Complaint, Gregg claims that "[t]he Defendants' threats, disciplinary actions, salary reductions, and constructive termination by forcing her to resign, interfered with her FMLA rights and constitutes violations of the FMLA[.]"  (Compl. ¶ 172).  To succeed on a claim of interference with FMLA rights, "a plaintiff must first show that her employer denied her FMLA benefits to which she was entitled."  <u>Lopera</u>, 578 F. Supp. 3d at 135 (citing 29 U.S.C. § 2615(a)(1) and <u>Carrero-Ojeda</u>, 755 F.3d at 722 n.8).  As the First Circuit has described, the "key issue" in any FMLA interference claim "is simply whether the employer provided its employee the benefits to which she was entitled per the FMLA."  <u>Carrero-Ojeda</u>, 755 F.3d at 722 (citing <u>Hodgens</u>, 144 F.3d at 159).  Regardless of the limitations period applied, the undisputed facts establish that the Defendants complied with their obligations under the statute.  Gregg herself has stated that at no point was she denied any FMLA leave that she requested and each one of her requests to use the benefit were granted.  (CSNOF ¶¶ 44-45; CSSOF ¶¶ 28-29; Duszlak Decl. 1, Ex. 6 at 46-47; <u>see</u> Shea Decl. ¶ 16).  <u>See</u> <u>Kleya v. Karl Storz Endovision, Inc.</u>, 385 F. Supp. 3d 99, 104 (D. Mass. 2019) (dismissing FMLA interference claim where plaintiff "received all her requested leaves."); <u>see</u> <u>also</u> <u>Lopera</u>, 578 F. Supp. 3d at 136 (plaintiff could not show that employer interfered with her ability to take FMLA leave where that leave had been approved).

To the extent that Gregg points to the denial of leave request in August 2018 as evidence of a violation of the statute, her argument must fail.  As Northeastern's policies and the statute itself make clear, Gregg could not have been eligible for FMLA leave at that time since she had not yet been employed by the University for at least 12 months.  (CSNOF ¶¶ 12-13; CSSOF ¶¶ 17, 28-29).  <u>See</u> <u>McArdle v. Town of Dracut/Dracut Pub. Schs.</u>, 732 F.3d 29, 33 (1st

Cir. 2013); see also 29 U.S.C. § 2611(2)(A).  It is undisputed that Gregg was provided with a copy

of the relevant policy and that Shea indicated as much during her meeting with Gregg back in

2018.  Gregg cannot claim that she was denied a benefit which she was ineligible to receive.

Similarly, any claim by Gregg that Shea or Zernicke discouraged or "repeatedly chill[ed]"

or "interfere[d]" with her use of FMLA leave is unsupported by the record evidence.  (Docket

No. 117 at 17).  While interference includes "not only refusing to authorize FMLA leave, but

discouraging an employee from using such leave" 29 C.F.R. § 825.220(b), the sole instance in

which Gregg claims she was "forced to reschedule" an appointment by Zernicke involved, in

actuality, her own voluntary decision to reschedule it because she felt as if Zernicke was "not

being fully supportive[.]"  (Duszlak Decl. 1, Ex. 45 at 2-3).  As documented by the relevant email

correspondence, however, Zernicke's inquiry concerned a request for Gregg to add more detail

to the ambiguous calendar appointments she had created which blocked off significant portions

of her workday.  Zernicke had made this request in order to have "a more clear idea of

[Gregg's] schedule/where abouts during business hours[,]" and there is no evidence that it had

been prompted by his approval, or disapproval, of any request or decision by Gregg to use

FMLA.[28]  (Duszlak Decl. 1, Ex. 45 at 3).  Gregg does not, and cannot, establish that she did not

ask for and take the leave she felt she needed.

---

[28] Zernicke's email had been sent at 8:50 a.m. on February 19, 2019, the same day Gregg received
approval for FMLA leave.  (Duszlak Decl. 1, Ex. 45 at 3).  It is not clear whether Zernicke, at that time,
knew of the approval or whether it had even been processed.  As Zernicke indicated in his response to
Gregg later that morning, he had first checked in the University's time-tracking system before asking her
about the calendar entry and saw nothing in there or in her calendar "to suggest it was personal time or
vacation."  (Id. at 2).  Zernicke ended his email by assuring Gregg that "FMLA [would] certainly make
[the] process smoother[.]"  (Id.).

There is likewise no evidence that Shea discouraged Gregg's use of FMLA leave or otherwise made the process onerous for her.  On the contrary, Shea remained responsive to each of Gregg's many questions and processed, in a timely manner, all of the revisions Gregg requested to Gregg's FMLA approval.  Even when viewed in the light most favorable to her, the conduct which Gregg challenges cannot amount to unlawful interference.  See Tucker v. Town of Scarborough, No. 2:19-cv-00213-GZS, 2020 WL 3271936, at *6 (D. Me. June 17, 2020) (plaintiff's own "characterization of his situation" was "not supported by the record[,]" which could not sustain a claim of FMLA interference).

Summary judgment is granted to the Defendants as to Count One.[29]

### 3.   Retaliation (Count Two)

Count Two of Gregg's Complaint includes a claim of FMLA retaliation.  There, Gregg asserts that "[t]he Defendants' disciplinary actions, adverse actions, and constructive termination were willful and were in retaliation of her request for intermittent FMLA leave[.]" (Compl. ¶ 172).  "[T]he FMLA forbids an employer from retaliating against an employee for exercising her FMLA rights."  Carrero-Ojeda, 755 F.3d at 719 (additional citations omitted).  "To state a retaliation claim under the FMLA where direct evidence of retaliation is lacking, a plaintiff must first make a prima facie showing that 1) she availed herself of a right protected by the FMLA, 2) she was adversely affected by a decision of her employer, and 3) there is a causal connection between her protected activity and the adverse employment action."  Lopera, 578 F. Supp. 3d at 136 (citing Hodgens, 144 F.3d at 161).  Upon making this showing, the burden shifts to the defendant who must then "articulate a legitimate, non-retaliatory reason for the

---

[29] Accordingly, the court does not reach the Defendants' alternative arguments as to Count One.

adverse action." Id.  Provided this is accomplished, the plaintiff is then "tasked with demonstrating that there is sufficient evidence for a reasonable juror to find that the stated reason is a pretext for retaliation." Id.

    a. Prima Facie Case

The parties do not appear to dispute that Gregg availed herself of a right protected by the FMLA, the first element of any prima facie case.  They do disagree, however, over the existence of the remaining two elements.

    i. Adverse Employment Action

Adverse employment actions are those "which 'typically involve[] discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'"  Eichenholz v. Brink's Inc., No. 16-cv-11786-LTS, 2019 WL 1061053, at *4 (D. Mass. Mar. 6, 2019), aff'd, 2020 WL 7213206 (1st Cir. Feb. 19, 2020) (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)) (additional quotations omitted).  As other courts have concluded, for the purposes of a claim of FMLA retaliation, they are those which "'a reasonable employee would [find to be] materially adverse' in the sense that [they] would dissuade the employee from taking FMLA leave."  Bellone v. Southwick-Tolland Reg'l Sch. Dist., 915 F. Supp. 2d 187, 199 (D. Mass. 2013), aff'd, 748 F.3d 418 (1st Cir. 2014) (quoting Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) and collecting cases) (first alteration in original).

Gregg claims to have "adduced substantial evidence of the materially adverse actions she encountered at the hands of the Defendants[.]"  (Docket 117 at 13).  With respect to Shea,

Gregg states that she "repeatedly was met with hostile conduct and confusion regarding her FMLA inquiries." (Docket No. 121 at 10). But as the Defendants argue and this court agrees, though Gregg claims that there are "many facts from which jurors could conclude that Shea retaliated against [her]" (Docket No. 121 at 11), she does not actually identify or describe any specific adverse action "relating to Shea that occurred on or after July 7, 2019," the period subject to the FMLA's two-year statute of limitations. (Docket No. 101 at 9-10).[30]

The particular adverse employment actions which Gregg ascribes to Zernicke are similarly imprecise. To the extent Gregg claims that her "future employment opportunities were sabotaged" by the Defendants and bases her retaliation claim on an adverse employment action related to her candidacy for the HR Coordinator role, this event would appear to be similarly time-barred as the relevant events occurred prior to July 7, 2019.[31] (Docket No. 121 at 10). Instead, the only two timely events which Gregg could possibly designate as adverse are Zernicke's July 22, 2019 email regarding his expectations for her performance and her own resignation—or "constructive discharge" as she labels it—from Northeastern on August 12, 2019. (Docket No. 103 at 9). Even construing the record most favorably to Gregg, these facts

---

[30] There is no evidence that Shea had any involvement in setting Gregg's performance expectations, evaluating or providing feedback with respect to Gregg's internal application, or alerting Zernicke or HR of any FMLA-related concerns. At her deposition, Shea testified that she could not recall ever communicating with Zernicke, or any of her colleagues, over concerns related to Gregg's FMLA leave. (See Duszlak Decl. 1, Ex. 1 at 31, 38).

[31] Gregg initially spoke with Zernicke regarding the reference on June 14, 2019. (See Duszlak Decl. 1, Ex. 56 at 3). Zernicke referred Pierce to Harding on June 17, 2019, (see id., Ex. 57 at 5) but by that point, as Pierce testified at her deposition, Pierce had already decided to move forward with the external candidate. (See id., Ex. 55 at 17). Furthermore, and perhaps more importantly, Gregg provides no evidence that her requests for, or her use of, FMLA leave "had any bearing" on Pierce's decision not to hire her, see Carrero-Ojeda, 755 F.3d at 721, and Pierce testified that Zernicke's response directing her to Harding "didn't impact [her] next steps in any way." (Duszlak Decl. 1, Ex. 55 at 23).

do not support her FMLA retaliation claim.

As the Defendants argue, Gregg resigned upon accepting a job which both paid more and included human resources responsibilities, a job function which she had been searching for in her next role.  (Docket No. 103 at 14-15).  Gregg does not appear to dispute this, and as she herself admits, when her "efforts to find employment elsewhere at Northeastern were defeated, she felt she had no choice but to leave Northeastern and apply elsewhere, ultimately resulting in her constructive discharge."  (Docket No. 117 at 8).  A constructive discharge occurs only where an employee's working conditions are "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign."  E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014) (additional quotations and citations omitted) (alteration in original).  Those conditions "must have been so intolerable . . . that her only option was to quit."  Id. (additional citation omitted).  This standard "is entirely objective" and "do[es] not put weight on the employee's subjective beliefs, no matter how sincerely held." Id. (additional quotations and citations omitted).  Though Gregg later adds in her Opposition that the "cumulative effect" of the "retaliatory treatment she experienced" impacted her "health and well-being and she was left with no choice but to . . . ultimately leave Northeastern" (Docket No. 117 at 13), this argument is not supported by the factual record. While Gregg may have been unhappy with her boss, the record does not support the conclusion that Gregg was compelled to leave.  See Eichenholz, 2019 WL 1061053, at *5 (plaintiff's theory of constructive discharge could not serve as the adverse employment action supporting his claim of FMLA retaliation where at the time he resigned, he had, among other things, "received all the FMLA leave which he initially sought" and jury could not conclude that a reasonable

[30]

person in his position "would have felt compelled to resign.").

Zernicke's "expectations" email cannot form this groundwork either.  Though Gregg

claims this email was retaliatory, as the Defendants point out, it "neither disciplined nor

demoted" her, nor did it deprive her of professional opportunities; it simply "set expectations"

with respect to her performance for the upcoming fiscal year.  (Docket No. 103 at 14-15).  Even

when viewed in the light most favorably to Gregg, there are no aspects of Zernicke's email from

which a reasonable juror could draw the necessary inferences.  See Tucker, 2020 WL 3271936,

at *7 (employer entitled to summary judgment on FMLA retaliation claim where plaintiff "ha[d]

not established he was adversely affected by an employment decision"; it was undisputed that

plaintiff "ha[d] never been denied FMLA leave" and had not been "terminated, demoted, or

disciplined since exercising FMLA leave" or denied a regular increase in pay); see also Gomez-

Perez v. Potter, 452 Fed. Appx. 3, 8 (1st Cir. Dec. 22, 2011) (recognizing that, in the context of

ADEA retaliation, "[n]either extreme supervision and snubbing, nor increased criticism, will

satisfy the adverse employment action prong.") (internal citations omitted).

For these reasons, Gregg falls short of establishing a prima facie case,[32] and the

---

[32] In the absence of an adverse employment action, the court does not need to reach the third and final element required for a prima facie case of FMLA retaliation: causal connection.  For completeness, however, the court finds that Gregg cannot establish a causal connection between the allegedly adverse employment actions and her requesting or taking FMLA leave.  "[T]here is some tension in the case law as to the appropriate causation standard to apply in FMLA retaliation cases."  Chase v. United States Postal Serv., 843 F.3d 553, 559 n.2 (1st Cir. 2016).  Department of Labor regulations "prohibit an employer from using an employee's decision to take FMLA leave as a 'negative factor' in employment actions[,]" while case law supports the use of "traditional principles of but-for causation" which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Id. (internal quotations and citations omitted).  Here, Gregg cannot meet even the less-demanding "negative-factor" test.  Gregg was given all the FMLA leave she requested, and, at most, the record supports the conclusion that Zernicke was attempting to get more information about the intermittent leave she was taking so that he could arrange for coverage as necessary.  As Zernicke stated in his email, with the exception of Gregg's "work-related meetings /

Defendants are entitled to summary judgment as to Count Two.[33]

### C.   Count Three: Intentional Interference with Contractual / Advantageous Relations

In Count Three of her Complaint, Gregg alleges that Zernicke and Shea intentionally interfered with her employment "by retaliating against her following her medical leave, use of FMLA leave and following her requests for investigations and internal complaints."  (Compl. ¶ 179).  Gregg's interference claim appears to be comprised of many of the same actions that make up her unsuccessful FMLA retaliation and interference claims.  Assuming, though, that the record and the circumstances surrounding her resignation from Northeastern could nevertheless support this independent cause of action, Gregg has not produced any evidence whatsoever that Zernicke or Shea acted with actual malice.

"To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) [she] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  Dobelle v. Flynn, 12 F. Supp. 3d 274, 296 (D. Mass. 2014)

---

commitments," he "neither [sought] nor expect[ed] the details (who, why, etc.)" of her appointments—just adequate notice of them.  (See Duszlak Decl. 1, Ex. 58 at 4).  Here, "the surrounding circumstances undermine any claim of causation."  Carrero-Ojeda, 755 F.3d at 720; see also Germanowski v. Harris, 854 F.3d 68, 74-75 (1st Cir. 2017) (where there was, among other things, preexisting tension between an employee and her supervisor, "common sense" suggested that alternative motives—and not a retaliatory motive with respect to the employee's FMLA use—were behind the particular adverse action) (additional quotations and citations omitted).

[33] In light of this conclusion, the court need not consider the Defendants' alternative arguments with respect to Count Two.

(quoting <u>Blackstone v. Cashman</u>, 448 Mass. 255, 260, 860 N.E.2d 7, 12-13 (2007)).[34]

Where, as here, "the plaintiff sues an official of the employer, [she] must satisfy an additional element: that the supervisor acted with 'actual malice.'"  <u>Eaton v. Town of Townsend</u>, No. 18-11824-LTS, 2022 WL 952189, *24 (D. Mass. Mar. 30, 2022), <u>aff'd</u>, No. 22-1334, 2023 WL 3317986 (1st Cir. May 9, 2023) (quoting <u>Zimmerman v. Direct Fed. Credit Union</u>, 262 F.3d 70, 75 (1st Cir. 2001)).  "Proof of actual malice requires more than a showing of mere hostility[,]" and a plaintiff must "demonstrate that spite or malevolence, <u>i.e.</u>, a purpose unrelated to any legitimate corporate interest, was the controlling factor" in engaging in the challenged conduct.  <u>Id.</u> (quoting <u>Alba v. Sampson</u>, 44 Mass. App. Ct. 311, 315, 690 N.E.2d 1240, 1243 (1998)) (emphasis omitted).  Finally, "'any reasonable inference of malice must . . . be based on probabilities rather than possibilities[,]'" and "such an inference requires an affirmative showing that the actions taken by the supervisor were not derived from a desire to advance the employer's legitimate business interests."  <u>Zimmerman</u>, 262 F.3d at 77 (additional citations omitted).

In her Opposition, Gregg claims—without more—to have "adduced sufficient evidence establishing that Shea did not like [her] and commented to co-workers that [Gregg] was driving her crazy."  (Docket No. 121 at 15).  Gregg's "evidence," however, falls well short of the above-articulated standard, which requires a showing of "spite" or "malevolence" and not simply an employee's own belief that she was not liked.  (Docket No. 121 at 15).  Shea's comment to a

---

[34] "[U]nder Massachusetts law, the tort of interference with an advantageous business relationship apparently includes within its ambit the tort of wrongful interference with an existing contract[.]" <u>Hamann v. Carpenter</u>, 937 F.3d 86, 92-93 (1st Cir. 2019).

coworker that Gregg's submission of repeated and conflicting FMLA leave approval forms was

making her "crazy" must be viewed in the context that Shea continued to process Gregg's

requests to ensure that she got all the FMLA leave to which she was entitled.  There is no

evidence in the record that would support the inference that Shea or Zernicke acted with any

purpose outside a legitimate business one.[35]  While, as Gregg contends, "'[t]he elements

underlying a claim for unlawful discrimination may be used to demonstrate malice in the

context of a tortious interference claim[,]'" (Docket No. 121 at 15, quoting Zimmerman, 262

F.3d at 77), here Gregg has failed to adduce facts to support either causes of action.  See

McArdle, 732 F.3d at 37 (where appellant's interference claim "relie[d] on the same theory as

his FMLA retaliation claim" it "fail[ed] for the same reason").

        Gregg also appears to base her claim of interference on her unsuccessful bid for the HR

Coordinator role, but this too must fail.  (Docket No. 121 at 14, 16).  There is no evidence that

Pierce ever asked for or received a reference from Zernicke, spoke with Zernicke about Gregg's

candidacy, or considered these events in her hiring decision.  (See Litsas Decl. 1, Ex. B at 2;

Duszlak Decl. 1, Ex. 55 at 17).[36]  See Rodriguez v. Don Shapiro Produce Co., Civil Action No. 17-

10174-MBB, 2019 WL 1383571, at *5 (D. Mass. Mar. 27, 2019) (summary judgment to

---

[35] As discussed above, there is no evidence that Shea managed Gregg's performance, contributed to or
participated in her evaluation, or communicated with Zernicke with respect to her performance or her
use of FMLA leave.

[36] Similarly, there is no evidence that Shea interfered with Gregg's candidacy for the HR Coordinator
position or that she even knew of Gregg's application for the role to begin with.  Shea testified that she
was never asked to provide a reference in connection with Gregg's application for the role, and that she
had no knowledge of Gregg's application or involvement in the hiring process.  (Shea Decl. ¶ 23).  See
Laudano v. 214 South Street Corp., 608 F. Supp. 2d 185, 196 (D. Mass. 2009) ("It is axiomatic that a
defendant cannot intentionally and tortiously interfere with a contract when she is unaware of its
existence.").

defendant on interference claim where, among other things, there was no evidence that

defendant had provided a negative reference for the plaintiff to any potential employer).

Summary judgment as to Count Three is granted to the Defendants.

**D.  Count Four: Intentional Infliction of Emotional Distress**

Gregg claims in the Complaint's final count that Zernicke "intentionally inflicted

emotional distress upon [her] as he knew or should have known that his actions would cause

her or caused her emotional distress."  (Compl. ¶ 181).  Any claim of intentional infliction of

emotional distress ("IIED"), however, is precluded by the exclusivity provision of the

Massachusetts Workers' Compensation Act ("WCA"), which "bars the use of that tort by an

employee (or former employee) against coworkers or employers acting within the scope of

their employment."  McArdle, 732 F.3d at 37 (additional citations omitted); see Mass. Gen.

Laws ch. 152, § 26.  "Massachusetts courts construe this provision broadly[.]"  Andresen v.

Diorio, 349 F.3d 8, 16 (1st Cir. 2003).

For her part, Gregg claims—but does not further expand on the assertion—that

Zernicke's "retaliatory harassment and abusive treatment cannot be said to constitute conduct

within the scope of employment or conduct in furtherance of the employer's interest."  (Docket

No. 117 at 18).  "An employee's action is within the scope of his employment when it is of the

kind he is employed to perform …; if it occurs substantially within the authorized time and

space limits …; and if it is motivated, at least in part, by a purpose to serve the employer…."

McArdle, 732 F.3d at 37 (affirming summary judgment dismissing IIED claim) (internal citation

omitted).  Although she does not specify any events in particular, as the Defendants recognize,

all of the conduct Gregg could possibly predicate her claim on, "occurred on the job" and

"within the context" and the confines of her and Zernicke's professional relationship.  (Docket

No. 127 at 9).[37]  <u>See</u> <u>Mendes v. WinnCompanies LLC</u>, Civil Action No. 23-10417-FDS, 2023 WL

8653702, at *4 (D. Mass. Dec. 14, 2023) (recognizing that the WCA "covers broadly any injury

that arises out of the employment relationship" and dismissing IIED claim) (citation omitted).

 Accordingly, the court grants summary judgment to the Defendants on Count Four.

## IV. <u>CONCLUSION</u>

 For all the reasons detailed herein, "Defendant Maryellen Shea's Motion for Summary

Judgment" (Docket No. 100) and "Defendants Northeastern University and Paul Zernicke's

Motion for Summary Judgment" (Docket No. 102) are ALLOWED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[37] (<u>See</u> <u>id.</u>, listing "*e.g.*, requesting calendar access, assigning work, approving training, scheduling, micromanagement, performance reviews, raises, employment references, goal setting, managing leaves of absence").